NORTHEAST WOMEN'S
CENTER, INC.

v.

Michael McMONAGLE, Dennis Sadler, Deborah Baker, Thomas Herihy, Anne Knorr, Robert Moran, Joseph P. Wall, Roland Markum, Howard Walton, Henry Tenaglio, Stephanie Morello, Annemarie Breen, Ellen Jones, Susan Silcox, Paul C. Armes, Walter G. Gies, John J. O'Brien, Patricia Walton, Kathy Long, Helen Gaydos, Donna Andracavage, Juan Guerra, Margaret Caponi, Mary Bryne, Linda Corbett, Thomas McIlhenny, and Patricia McNamara.

Civ. A. No. 85–4845.

United States District Court,
E.D. Pennsylvania.

Aug. 27, 1990.

Edmond A. Tiryak, Kathryn Kolbert, Planned Parenthood, Philadelphia, Pa., for plaintiff.

Theresa Mallon Connolly, Jenkintown, Pa., for defendants.

### MEMORANDUM

LOWELL A. REED, Jr., District Judge.

This case comes before me on remand from the Court of Appeals for the Third Circuit for further consideration of the injunctive relief to be granted in light of its opinion in *Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342 (3d Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989).

Before the court is the motion of the plaintiff for supplemental injunctive relief on remand.[1] I have reviewed the entire district court evidentiary record as relied upon and accepted by the court of appeals, and have examined the testimony and evidence presented at hearings held before me on April 5, 1990 and July 27, 1990. For the reasons set forth below, the motion of the plaintiff will be granted, and the present injunction shall be expanded.[2]

1. The parties have briefed extensively the issue of whether the injunction should indeed be expanded, and the court heard oral argument on July 31, 1990.

## I. *Findings of Fact and Procedural Background*

1. Plaintiff, the Northeast Women's Center, Inc. (Center), is a Pennsylvania corporation which provides gynecological services, including pregnancy testing, counseling and abortions.

2. Defendants are twenty-six individuals who are vigorously opposed to abortion and who have repeatedly protested the Center's abortion services by activities at the site of the Center.

3. In August 1985, plaintiff filed a civil suit, alleging that defendants had agreed among themselves and others to disrupt the Center's business and injure its property by, *inter alia,* harassing the Center's clients and employees, unlawfully entering on its property, and destroying and damaging medical equipment.

4. Plaintiff sought damages and injunctive relief under the Sherman Anti-Trust Act, 15 U.S.C. §§ 1–7, the Clayton Act, 15 U.S.C. §§ 12–27, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, and the common law torts of trespass and intentional interference with contract.

5. The district court denied defendants' motion to dismiss plaintiff's complaint. *Northeast Women's Center v. McMonagle,* 624 F.Supp. 736 (E.D.Pa.1985).

6. At the conclusion of the trial, the district court directed a verdict in favor of defendants on plaintiff's antitrust claim, and sent to the jury the RICO, trespass and intentional interference with contractual relations claims.

7. On May 20, 1987, a jury returned a verdict in favor of plaintiff and against all defendants on the RICO claims, against all but three defendants on the trespass claim, and against defendants Stephanie Morello, Joseph Wall and Howard Walton on the intentional interference with contract claim.

2. Pursuant to Federal Rule of Civil Procedure 52(a), this memorandum constitutes the court's findings of fact and conclusions of law.

8. On June 8, 1987, Judge James McGirr Kelly of this court issued an injunction as to plaintiff's trespass claim only, enjoining defendants from entering the Center's premises, entering the parking lot adjacent to the Center for the purpose of protesting, picketing, demonstrating, chanting, shouting, leafletting, or using sound amplification equipment; blocking or attempting to block the entrances to the Center or parking lot, and *"[i]nhibiting or impeding or attempting to inhibit or impede the free and unmolested ingress and egress [to the Center or parking lot]."* *Northeast Women's Center v. McMonagle,* 665 F.Supp. 1147, 1163 (E.D.Pa.1987) (emphasis added).

9. Judge Kelly declined to grant plaintiff any injunctive relief with respect to the acts of harassment and intimidation of the Center's employees and patients which provided the evidentiary basis for the jury's liability verdicts on the RICO and interference-with-contract claims because the court concluded, based upon its finding that plaintiff violated the Pennsylvania Abortion Control Act, 18 Pa.Cons.Stat.Ann. § 3214(c), that such relief was barred by the doctrine of unclean hands.[3]

10. On July 25, 1988, this case was reassigned from the Honorable James McGirr Kelly to me.

11. On March 2, 1989, the United States Court of Appeals for the Third Circuit affirmed the jury's verdict, but held that the district court erroneously applied the unclean hands doctrine in denying the injunctive relief which plaintiff sought because the court concluded that even if plaintiff had violated section 3214(c), an issue the court did not reach, "such a violation [was] at most collateral to the matter involved in the lawsuit." 868 F.2d at 1354.

12. Because the court of appeals found "unsupportable as a matter of law the only

basis on which the district court declined to issue a more extensive injunction," it remanded the case so that this court could reconsider the Center's argument that the present injunction is inadequate.[4] *Id.* at 1356.

13. On October 10, 1989, the United States Supreme Court denied certiorari. *McMonagle v. Northeast Women's Center,* — U.S. —, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989).

14. On October 16, 1989, the Court of Appeals for the Third Circuit remanded the matter to me "for further consideration of the injunctive relief to be granted in light of the opinion of this Court." *See* Judgment of October 16, 1989 (Document No. 341).

15. On April 3, 1990, plaintiff petitioned this Court for a temporary restraining order, asking that I enjoin defendants from what it anticipated would be non-peaceful demonstrations at the site of the Northeast Women's Center during the week before Easter.

16. On April 5, 1990, I held a hearing on plaintiff's motion for a temporary restraining order to determine whether emergency injunctive relief was in fact required to protect plaintiff's patients and staff.

17. On April 6, 1990, I found that plaintiff proved, both from the ample evidence presented at trial and the hearing of April 5, 1990, that further non-peaceful activity was likely to occur during Easter week. Accordingly, I granted plaintiff's motion and issued a temporary restraining order setting forth reasonable time, place and manner restrictions and enjoining defendants, and all those acting in concert or participating with, by or through them from engaging in specific non-peaceful activity at the site of the Northeast Women's Center.

---

**3.** For a more complete discussion of the unclean hands doctrine, *see infra* pages 1086–87 and accompanying notes.

**4.** The court of appeals refrained from reaching the issue of whether injunctive relief was available to private parties under the RICO statute. Instead, it concluded that there was "no impedi-

ment to basing injunctive relief on the interference with contractual relations verdict." *Northeast Women's Center,* 868 F.2d at 1355. Accordingly, my consideration of plaintiff's motion for further injunctive relief on remand is based on the jury's interference-with-contractual-relations verdict only.

18. Despite the issuance of the restraining order issued by this court, several Philadelphia Police arrest reports as well as reports and a videotape taken by the United States Marshal's Office document apparent violations occurring on the site of the Center in direct contravention of the terms of the restraining order.

19. By its terms, and pursuant to Federal Rule of Civil Procedure 65(b)(2), the April 6th temporary restraining order expired on April 16, 1990.

20. On July 27, 1990, I held a hearing at which time I heard testimony which addressed plaintiff's eighth motion for sanctions and contempt (Document No. 337) of the June 8, 1987 injunction. At the conclusion of that hearing, I took plaintiff's motion for contempt under advisement. This testimony has been reviewed and been made part of the official record in this case. Accordingly, I have considered the evidence presented at the July 27th hearing in evaluating plaintiff's motion for supplemental relief on remand.

21. On July 31, 1990, I heard oral argument concerning the issues raised in plaintiff's motion for supplemental injunctive relief on remand.

## II. Conclusions of Law

### A. Permanent Injunctive Relief

■ It is a basic tenet of equity jurisprudence that district courts, in fashioning equitable decrees, are vested with broad discretionary powers. *Lemon v. Kurtzman*, 411 U.S. 192, 200–01, 93 S.Ct. 1463, 1469–70, 36 L.Ed.2d 151 (1973). This discretion, however, is not without limitations and should be tempered to insure that the equitable relief issued is "carefully tailored to remedy only the specific harms shown." *Northeast Women's Center*, 665 F.Supp. at 1153.

■ Before a permanent injunction may be issued, plaintiff must establish that (1) the court's exercise of equity jurisdiction is proper; (2) plaintiff has actually succeeded on the merits of its claims; and (3) the balance of the equities tips in favor of injunctive relief. *Id. See also Wilkerson v. Sullivan*, 727 F.Supp. 925, 936 (E.D.Pa. 1989); 11 C. Wright & A. Miller, Federal Practice and Procedure §§ 2942–44 (1973). I will consider each of these components seriatim.

### 1. *Equity Jurisdiction*

■ The predicate inquiry in evaluating whether to issue permanent injunctive relief is whether the court may properly exercise equity jurisdiction. "Equity jurisdiction is proper if (1) plaintiff has no adequate legal remedy, (2) the threatened injury is real, not imagined, and (3) no equitable defenses preclude jurisdiction." *Northeast Women's Center v. McMonagle*, 665 F.Supp. at 1153. *See* 11 C. Wright & A. Miller, Federal Practice and Procedure, §§ 2942–44 (1973).

■ Judge Kelly found that all three of these conditions precedent to a proper exercise of equity jurisdiction existed as to plaintiff's trespass claim. 665 F.Supp. at 1153–54. In so concluding, the district court made the following factual findings in accordance with Federal Rule of Civil Procedure 52(a), which I now reiterate and adopt.[5] With regard to the first element—whether plaintiff has an adequate legal remedy—the court found the following facts specially:

The evidence adduced at trial demonstrated that the defendants have appeared regularly at the sites of the Northeast Women's Center to protest. Each of the twenty-four defendants found liable for trespass had entered the premises of the Center on at least one and as many as three occasions. On none of the trespass dates had the Center willingly permitted the defendants to enter the premises. The defendants are motivated by a vibrant and unwaveringly view that the practice of abortion is a heinous evil that cannot be endured.

---

**5.** I note that these findings are, of course, the law of this case as the court of appeals affirmed this portion of the district court opinion. My use of the term "adopt" therefore is meant to convey my complete agreement with these conclusions having myself concluded independently that these facts are clear from the evidentiary record.

The spirited nature of their views permits no remorse or regret for their actions. No evidence produced at trial suggests that their unlawful modes of protest will cease. In fact, the evidence suggests precisely the opposite. The pendency of this lawsuit has not deterred defendants from unlawful protest activities. Since this suit was filed in August 1985, each of the twenty-four trespassers has been present at the Center when illegal entries were made and nineteen of the twenty-four have actually entered the premises. Since the move to Comly Road in June 1986, the Center has been the site of at least one attempted illegal entry, thwarted only by the installation of sophisticated security equipment.

*Id.* at 1153. Based upon these facts, the court found plaintiff's injury "to be a continuing one for which no adequate legal remedy is available."[6] *Id.* Accordingly, it concluded, as do I, that the first part of the equity jurisdiction equation had been satisfied.

The court then analyzed the second element—whether the threatened injury is real, not imagined. Using the same facts set forth above, Judge Kelly determined that "the nature of the defendants' motivation and their conduct since this lawsuit was filed demonstrates that there exists a present, actual threat of trespass at the Comly Road site." *Id.* at 1154. Thus, the court found, as I do now, that "[t]he plaintiff's fear of future injury is real and not imagined." *Id.*

The district court proceeded next to determine whether any equitable defenses existed to preclude jurisdiction and found that the court was unable to exercise equity jurisdiction over plaintiff's RICO and interference-with-contract claims because of the clean hands defense. The Court of Appeals for the Third Circuit, reversing the district court's decision to apply the equitable defense of unclean hands to preclude imposing injunctive relief for plaintiff's RICO and interference-with-contract claims, stated as follows:

As this court has explained, the equitable doctrine of unclean hands is not "a matter of 'defense' to the defendant." *Gaudiosi v. Mellon,* 269 F.2d 873, 882 (3d Cir.), *cert. denied,* 361 U.S. 902 [80 S.Ct. 211, 4 L.Ed.2d 157] (1959). Rather, in applying it "courts are concerned primarily with their own integrity," *id.,* and with avoiding becoming " 'the abettor of iniquity.' " *Monsanto Co. v. Rohm & Haas Co.,* 456 F.2d 592, 598 (3d Cir.), *cert. denied,* 407 U.S. 934 [92 S.Ct. 2463, 32 L.Ed.2d 817] (1972) (citations omitted). Thus, the doctrine is to be applied "only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245–46 [54 S.Ct. 146, 147–48, 78 L.Ed. 293] (1933).

The same principle applies under Pennsylvania law. *See In Re Estate of Pedrick,* 505 Pa. 530, 544, 482 A.2d 215, 222 (1984). Pennsylvania's Supreme Court has stated that the unclean hands doctrine is not to be applied "to collateral matters not directly affecting the equitable relations which exist between the parties." *Shapiro v. Shapiro,* 415 Pa. 503, 507, 204 A.2d 266, 268 (1964).

Even if there had been a violation of the requirement of section 3214(c) relating to examination of fetal tissue by one of the physicians practicing at the Center, an issue we do not reach, such a violation is at most collateral to the matter involved in this lawsuit. Section 3214(c) is a technical provision aimed at policing compliance with the now inoperative nonviability certification requirement of section 3211. It has no connection at all to the Defendants' actions which the jury found violated both federal and state law.

868 F.2d at 1354 (footnotes omitted).

Thus, the court of appeals found unsupportable as a matter of law the only basis on which the district court declined to issue a more extensive injunction.

---

**6.** Based upon the record before me, that injury is continuing to the present time.

Despite the court of appeals' finding that the unclean hands doctrine could not be used with regard to section 3214(c) of the Abortion Control Act, defendants now renew their argument that plaintiff violated section 3204(b) of that Act because they allege that the Center fails to sufficiently counsel patients in order to determine whether the physician believes the abortion is necessary.[7] Section 3204(b) provides:

> Except in a medical emergency where there is insufficient time before the abortion is performed, the woman upon whom the abortion is to be performed shall have a private medical consultation either with the physician who is to perform the abortion or with the referring physician. The consultation will be in a place, at a time and of a duration reasonably sufficient to enable the physician to determine whether, based on his best clinical judgment, the abortion is necessary.

Defendants assert that this section is directly related to the subject matter at issue in this action, and thus may be used as an equitable defense to preclude jurisdiction. They argue that because these patients are not getting the proper counselling inside the clinic, and because the defendants wish to counsel these patients, this issue is not collateral to the lawsuit. Defendants' argument is fallacious. Defendants confuse the subject matter of this litigation. The issue in this case is *not*, as defendants assert, the right to counsel patients, but rather the defendants' violations of state and federal law which the jury concluded plaintiff proved. Moreover, the equity which plaintiff seeks is not a ban on defendants' right to counsel its patients, but rather reasonable limits on where and in what manner these patients may be counselled. While I make no determination as to whether plaintiff violated section 3204(b),[8] I find that regardless of whether this section was violated, this issue is at most collateral to the matter at issue in this case.[9]

Accordingly, because I find that no other equitable defenses exist to preclude jurisdiction, I conclude that all three elements of the equity jurisdiction equation have been satisfied as to both the trespass and interference with contract claims.[10]

### 2. Actual Success on the Merits

After answering an extensive series of special interrogatories, the jury found twenty-four of the defendants liable for trespass, and three of the defendants liable for interference with contractual relations.[11] Accordingly, plaintiff has succeeded on the merits of these claims.

### 3. Balance of Equities

I hold today that the balance of equities clearly favors granting plaintiff permanent

7. Although defendants had raised this argument before Judge Kelly, the district court found that section 3214(c) provided sufficient independent grounds for denying injunctive relief and therefore did not reach this issue. 665 F.Supp. at 1158 n. 12.

8. I note that if plaintiff has in fact violated section 3204(b), this violation can be enforced through the proper state regulatory authorities.

9. It should be remembered that the unclean hands doctrine "should not be applied to produce an inequitable result." *Universal Builders Inc. v. Moon Motor Lodge,* 430 Pa. 550, 555, 244 A.2d 10, 14 (1968). Thus, even if there was a violation, I am not compelled to apply the unclean hands doctrine to preclude jurisdiction unless I believe that equity would result. Because I am convinced that justice and equity would not be served by applying the maxim of unclean hands to either plaintiff's interference with contractual relations or trespass claims, even if plaintiff did violate section 3204(b), a finding I certainly do not make, and even if this issue was not collateral to the matter involved in this case, I would nevertheless reject defendants' assertion that the unclean hands doctrine should preclude me from issuing a more expansive injunction.

10. As stated *supra* in note 4, I need not reach the issue of whether injunctive relief is available to plaintiff under the RICO statute, and therefore do not address whether the court has equity jurisdiction over this claim.

11. Because there is ample evidence in the record that the defendants acted in concert with one another, and because the court of appeals rejected defendants contention that injunctive relief could only be issued against the three defendants found liable for interference with contractual relations, 868 F.2d at 1355, for purposes of this analysis I find that plaintiff has succeeded on the merits on both its trespass and interference with contract claims.

injunctive relief for both its trespass and interference with contract claims. At trial, "plaintiff pleaded and proved that Defendants embarked on a willful campaign to use fear, harassment, intimidation and force against the Center through targeting its employees so that they would, and some did, sever their employment at the Center." *Northeast Women's Center*, 868 F.2d at 1355. The evidence in this case is clear and unambiguous that defendants have and will continue to voice their strong convictions that "the practice of abortion is a heinous evil that cannot be endured." *Northeast Women's Center*, 665 F.Supp. at 1153. While defendants have a First Amendment right to hold and express these views, they do not possess an unrestricted right to convey their beliefs in any way they desire, regardless of the unlawful consequences and impact their actions have on others. In contrast, plaintiff's actions, while morally repugnant to defendants, are nevertheless legal. Moreover, plaintiff, its patients, and its staff have a right "to be free from nonprivileged invasions of their property, ... and to have contractual relations free from nonprivileged interference by others." *Roe v. Operation Rescue*, 710 F.Supp. 577 (E.D.Pa.1989). Thus, without hesitation, I conclude that the balance of the equities weighs in favor of plaintiff.

The injunction I shall issue against trespass and interference with contractual relations serves the public interest. It reasonably balances the protection of the Center's private property rights, including the rights of its employees and patients to be free from intimidation, harassment and assaults, while preserving defendants' rights of free expression. Thus, the injunction balances the rights of all parties by "ensur[ing] that the constitutional rights of one group are not sacrificed in the interest of the constitutional rights of another." *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1364 (2d Cir.1989).

**B. First Amendment**

The injunction I shall issue has been tailored carefully to protect plaintiff, while preserving defendants' right to free speech under the First Amendment. However, because the injunction limits the extent to which defendants may demonstrate and picket on an issue of public concern, and because any restraint on speech must be scrutinized to determine whether it is constitutionally infirm, I must analyze closely the supplemental injunctive relief imposed today.

I begin with the bedrock principle that this country has "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open...." *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). However, it is equally axiomatic that the First Amendment does not "guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Soc'y for Krishna Consciousness*, 452 U.S. 640, 646–47, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981). *See also Adderley v. Florida*, 385 U.S. 39, 47–48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966). Thus, while defendants' speech is protected by the First Amendment, their speech may be subject to reasonable time, place and manner restrictions. *Hynes v. Mayor of Oradell*, 425 U.S. 610, 616–17, 96 S.Ct. 1755, 1758–59, 48 L.Ed.2d 243 (1976). Time, place and manner restrictions are reasonable provided they are imposed "without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in doing so they leave open ample alternative channels for communication of the information." *Heffron*, 452 U.S. at 648, 101 S.Ct. at 2564. *See Frisby v. Schultz*, 487 U.S. 474, 481, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988) (quoting *Perry Education Ass'n v. Perry Legal Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983)). The injunction issued today meets all three of these criteria.[12]

**12.** The standard for reviewing time, place and manner restrictions on expression protected by the First Amendment depends upon the nature of the forum being regulated. The instant case involves a hybrid of public and private fora. While the L.P. Partnership and Comly Road

### 1. Content–Neutral

Because speech which is based upon either its content or subject matter is subject to a more exacting scrutiny than speech which is content-neutral, *see Pennsylvania Alliance for Jobs & Energy v. Council of Borough of Munhall,* 743 F.2d 182, 185 (3d Cir.1984), the threshold inquiry must be whether the injunction issued today discriminates against the defendants on the basis of the speech they wish to communicate.

"The primary concern of content-neutrality is that no speech or expression of a 'particular content' is 'single[d] out' by the government for better or worse treatment." *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1363 (2d Cir.1989) (quoting, in part, *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)). "The test is neutrality." *Id.* The injunction issued today clearly passes this test. The injunction refrains from referring, in any way, to the specific beliefs of the defendants, and does not even hint at the general subject matter of the issues raised at their demonstrations.[13] Instead, it focuses exclusively on the location and manner of expression, and attempts to protect the Center from non-peaceful activity including physical harassment and intimidation. In fact, there is nothing in the injunction which even ·impliedly makes the content of speech a factor in determining whether the injunction has been violated. *All* protestors, regardless of their convictions, are prohibited from communicating those views in a non-peaceful way.[14] It is clear that the injunction I issue today "is not a ban, nor is it a ban masquerading as a limitation. In fact, the order ensures that a forum remain open to defendants to express their views both to the general public and to those entering or leaving the [Center]." *Id.* Accordingly, I conclude that the injunction I shall issue is content and viewpoint-neutral, and will proceed to analyze whether the reasonable time, place and manner restrictions the injunction impose are narrowly tailored to meet a significant interest, and whether it leaves open ample alternative means of communication.

### 2. Government Interest

The restrictions the injunction impose serve several governmental interests and is narrowly tailored to meet those interests. First, the government has a strong stake in preserving the peace, protecting its citizens and maintaining public safety. *New York State Nat'l Org. for Women v. Terry,* 886

---

Associates property is unquestionably private, the sidewalk abutting that property is public, as are the streets in front of the individual residences of plaintiff's staff and employees. *See Frisby v. Schultz,* 487 U.S. 474, 480–81, 108 S.Ct. 2495, 2499–2500, 101 L.Ed.2d 420 (1988) (public streets and sidewalks hallmarks of traditional public forum). "If the proposed forum for expression is not a public forum, the regulation will be upheld as long as the restrictions are reasonable and are not directed at opposing the views of particular individuals." *Community for Creative Non–Violence v. Turner,* 893 F.2d 1387, 1390 (D.C.Cir.1990). In contrast, public fora are subjected to a more stringent test: the regulation must be content-neutral, must be narrowly tailored to serve a significant government interest, and must allow for alternative channels of communication. *Id.* Because I find that all of the restrictions the injunction impose are valid even under the more stringent public fora analysis, I will proceed to use this latter test to determine whether the injunction is constitutionally sound.

13. *See Ward v. Rock Against Racism,* — U.S. —, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) ("Government regulation of expressive activity is content-neutral so long as it is '*justified* without reference to the content of the regulated speed.'") (quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984).

14. Defendants argument that the injunction is content-based because it enjoins only defendants and those acting in concert with them, is without merit. The reason the injunction is directed at defendants and their agents is because plaintiff proved at trial that these individuals engaged in non-peaceful and disruptive activity which served to harass and intimidate its staff and patients. Having succeeded at trial, plaintiff now seeks injunctive relief to enjoin the activity which a jury found constituted trespass and interference with contractual relations. Because there is nothing in the injunction which even remotely addresses the particular content of the speech being restrained, I find that defendants would not be discriminated against on this basis.

F.2d 1339, 1363 (2d Cir.1989). When the form of defendants' protest threatens and invades the safety and well-being of others, the government may create reasonable means to curtail defendants, as well as the conduct of their officers, agents, servants, employees attorneys, and all persons acting in concert or participating with, by or through them [15] so that their activity remains peaceful and nonviolent.

The evidence reveals that plaintiff's have proved, during the course of a three week jury trial and through evidence presented at the April 5, 1990 temporary restraining order hearing as well as at the July 27, 1990 hearing which addressed plaintiff's eighth motion for contempt, that non-peaceful activity has in fact occurred and will continue to occur at the Northeast Women's Center facility and at the residences of its staff or patients. Indeed, an "assistant district attorney who witnessed a demonstration testified that the demonstrators' activity rose to a 'frenzy' and that he delayed leaving the Center out of fear for his physical safety." 868 F.2d at 1346.

While defendants of course have a right to vehemently oppose abortion, the First Amendment does not provide defendants with an unfettered right to trespass on plaintiff's private property, or to harass, intimidate and assault its patients and staff. "Nor does the First Amendment protect expressive conduct characterized by violence." *Northeast Women's Center*, 665 F.Supp. at 1159 (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916, 102 S.Ct. 3409, 3427, 73 L.Ed.2d 1215 (1982)). Moreover, other courts in this circuit have stated that "when defendants' activities impinge and interfere with the rights of other, the court might be forced and would not hesitate to impose reasonable time, place, and manner restrictions on defendants' conduct." *Roe v. Operation Rescue*, 710 F.Supp. 577, 588 (E.D.Pa.1989). *See also Armes v. City of Philadelphia*, 706 F.Supp. 1156, 1163–64 (E.D.Pa.1989).

Second, the government also possesses a significant interest in "protecting the ability of the clinic to provide medical services free from interference that may endanger the health and safety of its patients." *Portland Feminist Women's Health Center v. Advocates for Life, Inc.*, 859 F.2d 681, 686 (9th Cir.1988). Testimony at trial disclosed that "the sound of chanting, amplified by bullhorns, was audible in the Center's operating room ... [and] put patients 'under considerably greater stress,' especially when going or coming out of general anesthesia." *Northeast Women's Center*, 868 F.2d at 1346. "Videotape evidence revealed demonstrators pushing, shoving and tugging on patients as they attempted to approach the Center, knocking over and crossing beyond police barricades and blocking the ingress of cars." *Id.* There should be little doubt that the government has a strong interest in restricting conduct which interferes with the provision of legally permissible medical care and insuring that its citizens, many of whom are undergoing a difficult period in their lives, are not subjected to fear and intimidation while attempting to receive such care.

Finally, the equitable relief granted is narrowly tailored to deal with these significant governmental interests. The most restrictive times, during which noise and crowd size are limited, are when surgery is performed. These restrictions are relaxed during the times when surgery does not take place. Accordingly, because the injunction serves significant government interests and is narrowly tailored to meet those interests, it satisfies the second basis upon which reasonable time, place and manner restrictions are judged.

### 3. *Alternative Means of Communication*

Finally, there are alternative avenues open for defendants to communicate their opposition to abortion.[16] As drafted, the

---

**15.** For a more complete discussion of the individuals who fall within the scope of the injunction, *see infra* pages 1092–94 and accompanying notes.

**16.** Because "blocking access to public and private buildings has never been upheld as a proper method of communication in an orderly society," *New York State Nat'l Org. for Women v.*

injunction, at all times, permits some peaceful demonstrations where defendants are free to communicate their views in a peaceful manner, and, at a public sidewalk adjacent to a main driveway into the Center parking lot, provides defendants with the opportunity to counsel those individuals they believe are contemplating obtaining an abortion, providing of course the individual *chooses* to speak with them. As the court of appeals has explained, those individuals opposed to abortion have "numerous *legal* alternatives ... available to pursue their goal of persuading women not to have abortions. For example, they could continue to march, go door-to-door to proselytize their views, distribute literature, personally or through the mails, and contact residents by telephone, short of harassment." *Northeast Women's Center*, 868 F.2d at 1352 (citing *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988)).

Thus, because I have already concluded that the injunction issued today is content-neutral and serves a significant governmental interest, and because I find now that alternative avenues are open to defendants to disseminate their views on abortion, I hold that the injunction imposes reasonable time, place and manner restrictions.

## C. Home Picketing

Next, plaintiff requests that the court expand the present injunction to enjoin defendants from picketing the homes of plaintiff's employees and staff. The defendants argue vociferously that any restraints placed on their ability to picket these residences impermissibly interferes with their First Amendment right of free speech.

The standard for reviewing time, place and manner restrictions for public fora are, as stated above, well established. The restraints on home picketing pass constitutional muster if the time, place and manner restrictions are content-neutral, are narrowly tailored to serve a significant

government interest, and leave open ample alternative channels of communication. *Perry Education Ass'n v. Perry Legal Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

The issue of home picketing was addressed in *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). In *Frisby*, the Court examined a town ordinance which banned any person from picketing "before or about the residence or dwelling of any individual in the Town of Brookfield." *Id.* at 477, 108 S.Ct. at 2498. As to picketing, the Court found that because the ordinance was "directed primarily at those who are presumptively unwilling to receive it, the State has a substantial and justifiable interest in banning it." *Id.* at 488, 108 S.Ct. at 2504. Thus, the Court concluded that the nature and scope of the ordinance was narrowly tailored, left open ample alternative channels of communication, and was content-neutral. Accordingly, the Supreme Court held that the ordinance was constitutional.

In light of *Frisby*, it is clear that the time, place and manner restrictions imposed by the injunction I shall issue do not infringe unreasonably on defendants' First Amendment rights.

First, with respect to the element of content-neutrality, the restricted speech directed at home picketing is the same as the speech directed at the picketing at Northeast Women's Center. Thus, for the reasons set forth in my above analysis enjoining activity at the Center,[17] I find that, with respect to home picketing, the planned injunction is content-neutral.

Second, it is without question that the government's "interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Carey v. Brown*, 447 U.S. 455, 471, 100 S.Ct. 2286, 2296, 65 L.Ed.2d 263 (1980). As the Court in *Frisby* recognized, "[o]ne important aspect of residential privacy is protection of

---

*Terry*, 886 F.2d 1339, 1364 (2d Cir.1989), I need of course consider only whether the injunction allows alternative means of *peaceful* communication.

17. *See supra* pages 1089–90 and accompanying notes.

the unwilling listener.... 'That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech ... does not mean we must be captives everywhere.' " *Frisby*, 487 U.S. at 484, 108 S.Ct. at 2502 (quoting, in part, *Rowan v. Post Office Dep't.*, 397 U.S. 728, 738, 90 S.Ct. 1484, 1491, 25 L.Ed.2d 736 (1970)).

At trial, "[t]hree employees testified that they were repeatedly subjected to picketing at their homes. Two of these employees stated that they resigned from their positions at the Center because of [d]efendants' actions at their homes and the Center." 868 F.2d at 1346. Moreover, this court heard testimony on July 27, 1990 that defendants participated in a demonstration at and blocked the driveway of one of the Center's physicians, preventing his egress by automobile and, for a period of time, preventing him from going to work at the Center.[18]

> The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt:

> " 'To those inside ... the home becomes something less than a home when and while the picketing ... continue[s].... [The] tensions and pressures may be psychological, not physical, but they are not, for that reason, less inimical to family privacy and truly domestic tranquility.' "

*Frisby*, 487 U.S. at 486, 108 S.Ct. at 2503 (quoting *Carey v. Brown*, 447 U.S. 455, 478, 100 S.Ct. 2286, 2299, 65 L.Ed.2d 263 (1980) (Rehnquist, J., dissenting) (quoting *Wauwatosa v. King*, 49 Wis.2d 398, 411–12, 182 N.W.2d 530, 537 (1971)). Thus, there can be little doubt that the government has a significant interest in insuring that defendants do not offensively intrude on the residential property of plaintiff's staff and employees.

Third, I must consider whether the injunction leaves open ample alternative channels of communication. Defendants are free to picket the area in the vicinity of the Center, where patients, employees and staff are present. Moreover, as in *Frisby*, defendants are not totally barred from all residential neighborhoods, and remain free to enter any neighborhood alone or in groups to march and peacefully spread their beliefs on the public ways. The planned injunction merely prevents defendants from picketing, harassing and intimidating plaintiff's staff and employees at or immediately adjacent to their homes. Therefore, I find that the planned injunction preserves defendants' alternative means of communicating their beliefs.

The final issue to be considered then is whether the injunction is narrowly tailored to "target[ ] and eliminate[ ] no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485, 108 S.Ct. at 2502. The portion of the injunction restraining home picketing is narrowly tailored because it is designed to protect only the residences of those individuals which have been or are anticipated to be the target of defendants' harassment and intimidation. Moreover, given the aggressive, willful conduct of defendants in the past and the singularity of their avowed mission, I do not believe plaintiff must wait for defendants to further picket and harass likely objects of the defendants' mission before I enjoin picketing and related activity at the homes of these likely targets. Because the residences of plaintiff's staff have in the past been made a target of harassment, intimidation and fear, I find that the injunction is narrowly tailored because it is restricted to those residences which either have been or are, based upon past events, reasonably and logically expected to become targets of non-peaceful and intimidating picketing.

Based upon the foregoing, I make the following findings: The portion of the

---

**18.** Defendants appear to argue that the doctor could have driven on the grass abutting the driveway in order to leave his home. This is nonsense. There is "a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, [in order to] avoid intrusions." *Frisby*, 487 U.S. at 484–85, 108 S.Ct. at 2502. If the defendants picketing of these residences has reached the point where a resident must plan strategically how he is to exit his home, I believe time, place and manner restrictions placing limitations on residential picketing is reasonable.

planned injunction restricting home picketing is content-neutral; preserving the sanctity of the home and the safety and well being of its occupant is a legitimate government interest; there are alternative channels of communication open to defendants; and the restrictions are narrowly tailored to achieve a significant government objective. Accordingly, I hold that an injunction in this case, restricting defendants' ability to picket the homes of the plaintiff's employees and staff is constitutional.

### D. Individuals Within the Scope of the Injunction

■ Defendants argue that the court is limited to restricting the scope of the injunction only to those individuals the jury found liable for that particular claim. I disagree. It is clear that this court has the discretion to reasonably design the scope of an injunction in order to meet the individual harm sought to be restrained. In fact, the court of appeals explicitly rejected defendants' argument that this court is limited in granting injunctive relief under the interference-with-contract claim to only those three defendants found liable under that count, and opined that "injunctions under Pennsylvania law are commonly entered against defendants and 'all persons acting in concert with them.'" *Northeast Women's Center*, 868 F.2d at 1355. Nevertheless, defendants continue to cling to their argument that this court may not enter an injunction under the interference-with-contract claim against anyone other than the

three defendants found liable under that count. I find this contention to be without merit, and conclude, as did the court of appeals, that

> Fed.R.Civ.P. 65(d) expressly provides an injunction will be binding on persons "in active concert or participation" with the parties enjoined who receive actual notice of the order. In light of the jury's finding that the three Defendants against whom the verdict was entered on the interference with contractual relations claim combined in an enterprise with other Defendants, it appears that the record would support an injunction directed at concerted conduct.

*Northeast Women's Center*, 868 F.2d at 1356. *See also Portland Feminist Women's Health Center v. Advocates for Life, Inc.*, 859 F.2d 681, 687 (9th Cir.1988) (injunction which tracks language of Rule 65(d) not overbroad).

At trial, "plaintiff pleaded and proved that [d]efendants embarked on a willful campaign to use fear, harassment, intimidation and force against the Center through targeting its employees so that they would, and some did, sever their employment at the Center." *Northeast Women's Center*, 868 F.2d at 1355. Indeed, as part of this "campaign," defendants organized and solicited others to join in what defendants have referred to as a series of "rescues."[19] Thus, defendants' activities are not merely limited to their *own* non-peaceful protests at the Center, but include enticing others to join in such violative conduct as well.[20] Accordingly, if this

---

19. Literature Operation Rescue circulates defines "rescues" as "*'physically* blockading abortion mills with [human] bodies, to intervene between abortionists and innocent victims.'" *National Organization for Women v. Operation Rescue*, 726 F.Supp. 1483, 1488 (E.D.Va.1989) (quoting Operation Rescue, National Day of Rescue—October 29, 1988) (emphasis in original).

The avowed purpose of these "rescue" attempts is close down the facility. "A protester is recorded stating, 'I bet you ten to one this place doesn't last six months.' Another added, 'This place is going to be shut down.'" *Northeast Women's Center*, 868 F.2d at 1346. In fact, defendant Michael McMonagle, leader of the activists, in an attempt to rally others to join in

these demonstrations, boasted that "this abortion chamber lost its lease because of the persistent prayers and protests of Pro Life citizens." *Id.* at 1346 n. 3.

20. I find it distressing that one of the ways defendants attempt to convince others to join them in the "rescue" missions is by emphasizing that most "rescuers" are not seriously punished for their illegal activity. Literature distributed for the July 4–6, 1990 "rescue" states as follows: "Rescuers are usually arrested, charged with a minor infraction, such as trespassing or disorderly conduct, and released the same day for a later court appearance. When we consider what is at stake, this sacrifice becomes very small indeed." *See* Exhibit A attached to Plain-

Court refused to enjoin those individuals who join in active concert with the defendants and who participate in non-peaceful activity through the defendants' invitation, the injunction would essentially be sapped of its strength. This, I cannot allow.

At the conclusion of the trial, Judge Kelly noted that "[t]he spirited nature of [defendants'] views permits no remorse or regret for their actions. No evidence produced at trial suggests that their unlawful modes of protest will cease. In fact, the evidence suggests precisely the opposite." 665 F.Supp. at 1153.[21] Based upon the conduct of the defendants since the conclusion of the trial, and the testimony presented at both the April 5th and July 27, 1990 hearings, I agree completely with Judge Kelly's conclusions and find that it is clear that defendants' non-peaceful activities at the Center will continue, and that such conduct remains a threat to plaintiff's business and the well-being of its staff and patients.[22] Thus, I conclude that enjoining merely the activities of the named defendants will be wholly insufficient to protect plaintiff and its staff and patients from the continued harassment, assaults and intimidation, which they have regrettably endured and will, inevitably, continue to endure unless a more complete injunction is issued.

### III. Conclusion

Plaintiff has prevailed at trial after a jury returned a verdict in its favor, and that verdict has been upheld by the Court of Appeals for the Third Circuit. Having succeeded at every stage of this litigation, and this court having found that it has equity jurisdiction, that the balance of the equities favors granting plaintiff permanent injunctive relief, and that an injunction setting forth reasonable time, place and manner restrictions at both the clinic location and the homes of plaintiffs, employees, agents and attorneys would not violate the First Amendment, I conclude that plaintiff is entitled to, and I shall issue, an injunction against acts of the defendants, their officers, agents, servants, employees and attorneys, and all persons acting in concert or participating with, by or through them.

An appropriate order follows.

### ORDER AND PERMANENT INJUNCTION**

AND NOW, this 27th day of August, 1990, upon consideration of the motion of the plaintiff Northeast Women's Center for supplemental injunctive relief on remand, the responses of the defendants thereto, and all legal memoranda in support of and in opposition thereto, having reviewed the entire district court evidentiary record as relied upon and accepted by the United States Court of Appeals for the Third Circuit[1] as well as the testimony and evidence presented at hearings held on April 5, 1990 and July 27, 1990, and having held oral argument on the motion on July 31, 1990, for the reasons set forth in the accompanying memorandum, and in accordance with the jury's verdict, their answers to special interrogatories and the June 8, 1987 judgment of this Court, it is hereby ORDERED and DECREED that:

A. The defendants, as named above, their officers, agents, servants, employees and attorneys, and all persons acting in concert or participating with, by, or

---

tiff's Ninth Motion for Sanctions and Contempt (Document No. 376).

**21.** Although the district court expressed these views in the context of its trespass discussion, the court of appeals concluded that this finding is "equally applicable to Defendants' other activities." *Northeast Women's Center,* 868 F.2d at 1353.

**22.** I take judicial notice that defendants' non-peaceful activities at the Northeast Women's Center occurred as recently as July 7–8, 1990. *See* Wiegand, *41 Children Arrested at Abortion*

*Protest,* Philadelphia Inquirer, July 7, 1990, at A–1; Stark, *In 2d Abortion Protest at Clinic, 133 Arrested,* Philadelphia Inquirer, July 8, 1990, at B–1. I have also seen television news broadcasts of the demonstrations at the Northeast Women's Center on or about April 13, 1990 during the period of the temporary restraining order of April 6, 1990.

** Editor's Note: A Modified Permanent Injunction was issued on November 1, 1990 and is published at 749 F.Supp. 695.

**1.** *Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342 (3d Cir.1989).

through them [2] are hereby PERMANENTLY and FINALLY ENJOINED and RESTRAINED from engaging in the following acts:

(1) At all times on all days, defendants are prohibited from entering the premises of the Northeast Women's Center, Inc. located at 2751/2811/2813 Comly Road in Philadelphia, Pennsylvania.

(2) At all times on all days, defendants are prohibited from entering the premises of L.P. Partnership or Comly Road Associates located at 2801–2813 Comly Road in Philadelphia, Pennsylvania for the purposes of protesting, picketing, demonstrating, chanting, shouting, leafletting, or using sound amplification devices.

(3) At all times on all days, defendants are prohibited from blocking or attempting to block, barricade, or in any other manner obstruct the entrances to the Northeast Women's Center, Inc. or the premises of L.P. Partnership and Comly Road Associates located at the addresses listed above.

(4) At all times on all days, defendants are prohibited from inhibiting or impeding or attempting to inhibit or impede the free and unmolested ingress and egress of persons to the Northeast Women's Center, Inc. or the premises of L.P. Partnership and Comly Road Associates located at the addresses listed above.

(5) During the hours 6:30 a.m. through 5:00 p.m. on Wednesdays, Fridays and Saturdays, during surgical procedures and recovery periods, no singing, chanting, use of bullhorns, sound amplification equipment, or other sounds or images observable to or within earshot of patients inside the Center are permitted, with the exception of those set forth in paragraph A(6), below.

(6) During the hours 6:30 a.m. through 5:00 p.m. on Wednesdays, Fridays and Saturdays, defendants are permitted to maintain no informational table closer than five hundred (500) feet from the plaintiff's property line described in subparagraph A(7) below except that one such table may be located on the sidewalk in front of the Comly Road building, at the location marked clearly with visual devices at the point designated on the attached plot plan as Area "A," with no more than one (1) sign attached to it displaying words of an informational, non-inflammatory and non-violent nature. Any two defendants or any two individuals selected by defendants may peacefully maintain the table and may distribute literature or speak to individuals who wish to communicate with them immediately at the table. The individuals who staff this table may not shout out or use sound amplification equipment or physically approach plaintiff's patients or staff, but may engage in communications consisting of conversation of a non-threatening nature with any patient or staff person who choose to approach the table and speak to them. Should any individual decline such communication, otherwise known as "sidewalk counseling," that person shall have the absolute right to leave or walk away, and defendants, as well as all those covered by this restraining order, shall not accompany such person, encircle, surround, harass, threaten or physically or verbally abuse those individuals who choose not to communicate with them. This communication or "sidewalk counseling" shall not limit the right of the Police Department and/or the United States Marshal to maintain public order by reasonably necessary rules and regulations as they decide are necessary at the Center.

(7) At all times including the times enumerated in paragraphs A(5) & (6), only as many as six (6) persons may peacefully picket on the sidewalk in front of the Northeast Women's Center, in two areas marked on the attached plot plan as Area "B" on both sides of the driveway. While acting as a picketer, each such person shall be clearly designated by clothing, signs or

---

**2.** For purposes of brevity, I shall hereafter refer to these individuals as "defendants." The use of this word, however, should not in any way be construed as limiting any portion of this permanent injunction to only those named defendants. It is this Court's clear intention that this permanent injunction shall apply to the defendants, as well as to their officers, agents, servants, employees and attorneys; and to all persons acting in concert or participating with, by, or through them who receive actual notice of this order by personal service or otherwise.

other plainly visible devices. The driveway shall be kept clear at all times for passage of vehicles and pedestrians and shall be clearly marked by plaintiff with plainly visible devices. Except as limited by paragraphs A(5) and A(6) above, the persons picketing may peacefully demonstrate, speak out, sing or chant on such days.

(8) At all times on all days, the defendants are prohibited from carrying out the following acts: (a) entering upon the Northeast Women's Center (L.P. Partnership and Comly Road Associates) property inside a borderline marked clearly by plaintiff with plainly visible devices to coincide with the outer perimeter of the area marked on the attached plot plan as Area "C," including the building, grounds, parking lots, or inner walkways; (b) seizing or attempting to seize control of the plaintiff's offices thereon; (c) blocking or attempting to block persons from entering plaintiff's building, grounds or parking lot; (d) physically abusing or tortiously harassing persons entering, leaving, working at, or using the Center's facilities; (e) physically assaulting, battering, encircling or surrounding plaintiff's staff members, employees or patients; and (f) any other actions which have or reasonably might have the effect of intimidating patients, employees or staff members.

(9) At all times on all days, defendants are prohibited from picketing, demonstrating or using bullhorns or other sound amplification equipment at the residences of plaintiff's employees or staff, or blocking or attempting to block, barricade, or in any other manner obstruct the entrances, exits or driveways of the residences of plaintiff's employees or staff.

(10) At all times on all days, defendants are prohibited from encouraging, inciting, or securing other persons to commit any of the acts listed in parts A(1), (2), (3), (4), (5), (6), (7), (8) or (9) above.

B. The United States Marshal's Office is directed to maintain such presence at the above addresses as it deems reasonably necessary in order to assist the court in enforcement of the terms of this order. The Marshal's Office shall:

(1) Post a copy of this order in at least one prominent public location at the above described Comly Road premises, or any other premises necessary to enforce the terms of this injunction, and insofar as practicable, provide or make available to each individual who appears at the above locations for the purpose of picketing, demonstrating, or communicating with patients, staff members or employees a copy of this order, noting in its records, the time and place where provided and, if possible, the identity, description or name and address of the individual who obtains each copy;

(2) Insofar as the Marshal's Office deems appropriate, it may communicate all or any term of this order to persons at the premises by verbal means;

(3) Yield responsibility for maintenance of the peace and the keeping of law and order to local and/or state law enforcement authorities;

(4) Immediately report to the Court the identities of the persons, and events and circumstances which show good cause to believe there have been violations of the terms of this order;

(5) Keep such logs and records as are necessary to record general events, and events and circumstances which show good cause to believe there have been violations of the order;

(6) If so ordered by the Court, and authorized by law, detain for purposes of identification and investigation, and for purposes of transporting them to be brought before the Court, those persons determined by the court based upon good cause shown, to have violated any term of this Order.

C. *Sanctions for Non–Compliance:*

The defendants, their officers, agents, servants, employees and attorneys, and all persons acting in concert or participating with, by, or through them, including all persons restrained by this order, after notice and hearing, shall be subject to contempt proceeding and the imposition of such sanctions as the court deems proper under the circumstances if it is shown that

this order has been violated. These sanctions may include if authorized by law: incarceration or detention, the posting of a bond, a penalty of five thousand dollars ($5,000.00) for each violation, payment of damages and attorneys' fees to plaintiff and such other sanctions against the contemnor as lawfully ordered by the court. The court may impose greater or lesser penalties in the event of aggravating, mitigating or extenuating circumstances.

D. *Service:*

Counsel for plaintiff shall immediately serve a copy of this order upon all counsel of record and all defendants, in person or by leaving a copy with an adult occupant of any residence or business office of counsel and each defendant and shall promptly file a certificate of such service with the Clerk. Defendants whose counsel are so served and counsel so served, and defendants and counsel who receive any other notice of the terms of this order, shall be bound by the order from the time of such service or receipt of such notice, whichever is earlier.

E. *Jurisdiction:*

The court retains jurisdiction in this action.

This permanent and final injunction is intended to modify, incorporate and supersede the terms of the permanent and final injunction issued by the Honorable James McGirr Kelly by his order dated June 8, 1987.

This permanent and final injunction is *not* intended to modify in any way the *judgment,* entered by Judge Kelly by his order dated June 8, 1987 in accordance with the jury's answers to special interrogatories, as it appears in paragraphs 1 & 2 of that order.

1098

APPENDIX

PROPERTY PLAN

Comly Road Assoc. & L. P. Partnership

2009-2813 Comly Rd., Philadelphia, Pennsylvania