RICHARD D. KAPLAN, M.D., MARGUERITE KAPLAN, AND MARGUERITE KAPLAN AS GUARDIAN AD LITEM FOR JACOB M. KAPLAN AND DAVID S. KAPLAN, PLAINTIFFS v. PROLIFE ACTION LEAGUE OF GREENSBORO, WILLIAM H. WINFIELD, JR., LINDA WINFIELD, RONALD W. BENFIELD, JOHN DOES I THROUGH XXV, AND JANE DOES I THROUGH XXV, DEFENDANTS

No. 9218SC459

(Filed 20 July 1993)

1. **Appeal and Error § 109 (NCI4th) — abortion picketing — doctor's residence — preliminary injunction — appeal allowed**

    An appeal was allowed from a preliminary injunction restricting abortion picketing around a doctor's residence because of the important First Amendment principles at issue.

    **Am Jur 2d, Appeal and Error §§ 47 et seq.**

    **Appealability of order granting, extending, or refusing to dissolve temporary restraining order. 19 ALR3d 403.**

2. **Injunctions §§ 5, 45 (NCI4th) — preliminary injunction — appeal — standard of review**

    The decision of a trial court to issue an injunction will be upheld if there is ample competent evidence to support the decision, even though the evidence is conflicting. However, the findings and other proceedings of the trial court which hears the application for a preliminary injunction are not bind-

1

KAPLAN v. PROLIFE ACTION LEAGUE OF GREENSBORO

[111 N.C. App. 1 (1993)]

ing at a trial on the merits. In determining whether a preliminary injunction was properly issued, the appellate court must examine the trial court's two stage inquiry: whether the plaintiff is able to show likelihood of success on the merits and whether plaintiff is likely to sustain irreparable loss or whether issuance is necessary for the protection of plaintiff's rights during litigation. It is not necessary that irreparable injury be beyond the possibility of repair or compensation, but that the injury be one to which the complainant should not be required to submit or the other party permitted to inflict and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law. The judge must balance the potential harm to the plaintiff against the potential harm to the defendant.

Am Jur 2d, Injunctions §§ 23 et seq., 341 et seq.

Appealability of order granting, extending, or refusing to dissolve temporary restraining order. 19 ALR3d 403.

3. **Trespass § 2 (NCI3d)— abortion picketing—preliminary injunction—intentional infliction of emotional distress—likelihood of success on merits**

Plaintiffs seeking a preliminary injunction against abortion picketing at a doctor's residence did not establish a likelihood of success on the merits on an intentional infliction of emotional distress claim where the record was devoid of any indication of the existence of any medical documentation of plaintiffs' alleged severe emotional distress or of any other forecast of evidence of severe and disabling psychological problems within the meaning of the test laid down in *Johnson v. Ruark*, 327 N.C. 283.

Am Jur 2d, Injunctions § 286; Trespass §§ 113-116.

Injunction against repeated or continuing trespasses on real property. 60 ALR2d 310.

4. **Nuisance § 5 (NCI4th)— abortion picketing—doctor's residence—private nuisance**

There was ample competent evidence to support the trial court's decision that there is a reasonable likelihood that plaintiffs will prevail on their private nuisance claim on the merits where plaintiff-doctor sought a preliminary injunction to restrict

KAPLAN v. PROLIFE ACTION LEAGUE OF GREENSBORO

[111 N.C. App. 1 (1993)]

abortion picketing at his residence; defendants contended that there could be no private nuisance because they did not misuse any property under their control but the two cases cited by defendants do not preclude plaintiffs' private nuisance claim; and the trial court did not err in its balancing of the utility of defendants' conduct against the gravity of the harm to plaintiffs. While peaceful picketing is protected by the First Amendment, numerous opinions have examined the substantial concerns regarding the captive audience that a home provides. Defendants' reasonable opportunity to be heard exists through ample alternative channels of communication.

Am Jur 2d, Nuisances §§ 143-153.

5. **Constitutional Law § 126 (NCI4th) — abortion picketing at doctor's residence — targeted residential picketing — evidence sufficient**

There was sufficient competent evidence in an action for a preliminary injunction to support the trial court's finding that defendants had engaged in targeted residential picketing where defendant William Winfield stated that he and the Prolife Action League would stop coming to plaintiffs' neighborhood only when Dr. Kaplan stopped performing abortions; defendants demonstrated on Waycross Drive in groups as large as approximately twenty-five people; signs used by the demonstrators specifically named Dr. Kaplan; literature disseminated by the Prolife Action League listed Dr. Kaplan as one of the "major abortionists from Greensboro that go to the clinics where we are praying"; defendants made similar demands in picketing the residences of other Women's Pavilion staff members; and the street in front of plaintiffs' home marks approximately the halfway point of the path of defendants' marches.

Am Jur 2d, Constitutional Law §§ 526-532.

Validity and construction of state statute or ordinance prohibiting picketing, parading, demonstrating, or appearing in public while masked or disguised. 2 ALR4th 1241.

Peaceful picketing of private residence. 42 ALR3d 1353.

Governmental regulation of nonlabor picketing as violating freedom of speech or press under Federal Constitution's First Amendment — Supreme Court cases. 101 L. Ed. 2d 1052.

6. **Constitutional Law § 126 (NCI4th) — abortion picketing at doctor's residence — preliminary injunction — finding that activities coercive**

The trial court did not err by finding that defendants' conduct was coercive in granting a preliminary injunction against abortion picketing at a doctor's residence where the order does not refer to defendant's intent to exercise a coercive impact as being the basis for injunctive relief and specifically emphasizes that the court granted injunctive relief to protect plaintiffs from targeted picketing and other threatening conduct, and defendants conceded in their affidavits and their appellate briefs that they intended to stop Dr. Kaplan and others from performing abortions.

**Am Jur 2d, Constitutional Law §§ 526-532.**

**Validity and construction of state statute or ordinance prohibiting picketing, parading, demonstrating, or appearing in public while masked or disguised. 2 ALR4th 1241.**

**Peaceful picketing of private residence. 42 ALR3d 1353.**

**Governmental regulation of nonlabor picketing as violating freedom of speech or press under Federal Constitution's First Amendment — Supreme Court cases. 101 L. Ed. 2d 1052.**

7. **Constitutional Law § 126 (NCI4th) — abortion picketing at doctor's residence — preliminary injunction — scope of relief**

Restrictions on abortion picketing at a doctor's house in a preliminary injunction were content-neutral where the injunction prohibits picketing within a limited protected zone near plaintiff's residence without referring to the subject matter of the picketers' expression; the injunction makes no mention of abortion or any other substantive issue; it does not flatly ban picketing throughout residential areas nor does it prohibit anti-abortion picketing while permitting residential picketing having other aims; and the injunction provides no invitation to subjective or discriminatory enforcement. The trial court did not focus on the effect or impact of defendants' message on potential users, but rather on defendants' physical presence having a deliberate intimidating effect on plaintiffs while at their home.

**Am Jur 2d, Constitutional Law §§ 526-532.**

KAPLAN v. PROLIFE ACTION LEAGUE OF GREENSBORO

[111 N.C. App. 1 (1993)]

Validity and construction of state statute or ordinance prohibiting picketing, parading, demonstrating, or appearing in public while masked or disguised. 2 ALR4th 1241.

Peaceful picketing of private residence. 42 ALR3d 1353.

Governmental regulation of nonlabor picketing as violating freedom of speech or press under Federal Constitution's First Amendment—Supreme Court cases. 101 L. Ed. 2d 1052.

8. **Constitutional Law § 126 (NCI4th)— abortion picketing at doctor's residence—preliminary injunction—narrowly tailored restriction**

A preliminary injunction against abortion picketing at a doctor's residence met the constitutionally mandated requirement that the injunctive relief be narrowly tailored. The government interest in the protection of residential privacy from the devastating effect of targeted picketing on the quiet enjoyment of the home was established by *Frisby v. Schultz*, 487 U.S. 474 and a restriction is narrowly tailored if it targets and eliminates no more than the exact source of evil it seeks to remedy. Defendants' argument that this injunction is an impermissible prior restraint fails because plaintiffs have shown a demonstrable threat of a private wrong (private nuisance); defendants' state constitutional argument was not made before the trial court and may not be made on appeal; defendants' conclusion that they have acted within the permissible bounds of the Greensboro ordinance against picketing, deduced summarily from the observation that they have not been cited for a violation nor arrested, does not preclude a preliminary injunction where plaintiffs have demonstrated the likelihood of a tort by defendants under state law; and the limited protected zone, encompassing 300 feet of each side of the center line of Waycross Drive, which is approximately two and one-half blocks long, does not offend defendants' First Amendment rights.

Am Jur 2d, Constitutional Law §§ 526-532.

Validity and construction of state statute or ordinance prohibiting picketing, parading, demonstrating, or appearing in public while masked or disguised. 2 ALR4th 1241.

Peaceful picketing of private residence. 42 ALR3d 1353.

KAPLAN v. PROLIFE ACTION LEAGUE OF GREENSBORO

[111 N.C. App. 1 (1993)]

Governmental regulation of nonlabor picketing as violating freedom of speech or press under Federal Constitution's First Amendment—Supreme Court cases. 101 L. Ed. 2d 1052.

9. **Constitutional Law § 126 (NCI4th)— abortion picketing at doctor's residence—preliminary injunction—alternative channels of communication**

A preliminary injunction prohibiting abortion picketing at a doctor's residence left open ample alternate channels of communication where plaintiffs' lawsuit did not seek to limit or preclude defendants' right to continue their demonstrations at Dr. Kaplan's business premises or to limit or preclude defendants' other activities, such as leafletting, and the order leaves open ample alternative places and channels of communication, including Dr. Kaplan's private medical office, the Women's Pavilion in Greensboro, demonstrations at other public sites, door-to-door solicitations, the distribution of literature, telephone calls, and mailings.

Am Jur 2d, Constitutional Law §§ 526-532.

Validity and construction of state statute or ordinance prohibiting picketing, parading, demonstrating, or appearing in public while masked or disguised. 2 ALR4th 1241.

Peaceful picketing of private residence. 42 ALR3d 1353.

Governmental regulation of nonlabor picketing as violating freedom of speech or press under Federal Constitution's First Amendment—Supreme Court cases. 101 L. Ed. 2d 1052.

10. **Injunctions § 32 (NCI4th)— abortion picketing at doctor's residence—preliminary injunction—organization subject to injunction**

The trial court did not err by enjoining the Prolife Action League even though defendants argued that the League is not an entity subject to injunction. Although not organized in a corporate or partnership form, it distributes literature, has its own mailing address, engages in correspondence, produces a monthly newsletter notifying interested persons of upcoming pro-life events such as meetings, pickets, and speeches, organizes demonstrations, and one defendant in her affidavit refers to herself as a director of the Prolife Action League.

Am Jur 2d, Injunctions §§ 247 et seq.

11. **Injunctions § 32 (NCI4th)— abortion picketing at doctor's residence—preliminary injunction—threatening conduct**

The trial court did not err by enjoining defendants from engaging in threatening conduct where there was evidence that defendant Benfield was convicted of a violation of N.C.G.S. § 14-277.1 for threatening Dr. Kaplan, that defendants Mr. and Mrs. Winfield counseled Benfield before and after the threat was made, and defendants' other actions could be reasonably perceived as threatening as well. However, the Court adopted a cautionary admonition restricting the focus of the injunction to the location and manner of expression rather than the content.

**Am Jur 2d, Injunctions §§ 247 et seq.**

Appeal by defendants from order signed 20 February 1992 by Judge Thomas W. Ross in Guilford County Superior Court. Heard in the Court of Appeals 14 April 1993.

On 20 February 1992, the trial court granted plaintiffs' motion for a preliminary injunction by entering the following order:

The Court has heard the plaintiffs' motion for a preliminary injunction under N.C. Gen. Stat. § 1-485(1)-(2). In connection with this motion, it has reviewed the plaintiffs' verified complaint, the affidavits of Mark Anderson, M.D., Nancy Cable-Wells, Maurice A. Cawn, Susan Gillet, R.N., Kay Lynne Inman, R.N., Joan Marsh, Sue P. Meschan, Joan Osborne, R.W. Saul, Jesse L. Warren, Linda B. Winfield, and William H. Winfield, Jr., and the briefs presented by the plaintiffs and by defendants Linda B. Winfield, William H. Winfield, Jr., and the Prolife Action League of Greensboro. The Court has heard this motion after giving notice to all parties, and has given all parties an opportunity to present arguments. Defendant Ronald W. Benfield failed to appear for the hearing on this motion, despite being properly served with the verified complaint and an order giving notice of the hearing. After considering the evidence, briefs, and arguments presented by the parties, the Court hereby grants the plaintiffs' motion for a preliminary injunction.

Pursuant to [G.S. 1A-1,] Rule 65(d) of the North Carolina Rules of Civil Procedure, the Court makes the following findings:

KAPLAN v. PROLIFE ACTION LEAGUE OF GREENSBORO

[111 N.C. App. 1 (1993)]

1. Dr. Richard Kaplan, one of the plaintiffs, is an obstetrician and gynecologist, who as one aspect of his medical practice performs abortions. Under North Carolina law and federal law, abortions are lawful medical procedures. *See, e.g.*, N.C. Gen. Stat. § 14-45.1 (1986).

2. The defendants have carried out activities designed to coerce Dr. Kaplan to stop performing abortions.

3. The defendants' activities have included at least twelve instances of targeted picketing at the home of Dr. Kaplan and his family. On these occasions, groups including defendants Linda Winfield, Bill Winfield, and other defendants have walked up and down the Kaplans' street, Waycross Drive, carrying signs that name Dr. Kaplan. Although these moving pickets go beyond the frontage of the Kaplans' house, they remain largely in sight of the Kaplans' house. The circumstances make clear that the defendants are targeting the Kaplans and are harming the Kaplans by manifesting a physical presence just outside their house. These circumstances include, among other things, statements by defendant William Winfield that he and the Prolife Action League of Greensboro will stop coming to the Kaplans' neighborhood only when Dr. Kaplan stops performing abortions.

4. Defendant Ronald Benfield has made a direct threat on Dr. Kaplan's life. In addition, the other defendants have engaged in conduct toward the Kaplans that the Kaplans have reasonably interpreted as threatening.

5. The Kaplans are likely to prevail on the merits of this case under their claims for intentional infliction of emotional distress and private nuisance.

6. The Kaplans will suffer irreparable harm unless the Court enjoins the defendants from carrying out targeted residential picketing against them and from threatening them.

7. The defendants have picketed against Dr. Kaplan's performance of abortions not only at the Kaplans' house, but at several other locations as well. These locations include the edge of the Kaplans' neighborhood, Dr. Kaplan's private medical office, and the Women's Pavilion in Greensboro. The defendants' own actions show that they have many alternative forums

and means of communicating their concerns, other than picketing in the Kaplans' immediate neighborhood.

8. Since the defendants have ample alternative means of communicating their views, the First Amendment allows the Court to enter a narrowly tailored, content-neutral injunction to protect the Kaplans' residential peace, privacy, and security. Under the analysis stated by the U.S. Supreme Court in *Frisby v. Schultz*, 487 U.S. 47 [4, 101 L.Ed.2d 420] (1988), the Court may enter an injunction to uphold these important interests by prohibiting targeted residential picketing, even if that targeted picketing goes beyond just one house. The Court specifically relies on the reasoning in several post-*Frisby* decisions that recognize that the First Amendment allows such an injunction. *See Northeast Women's Center, Inc. v. McMonagle*, 939 F.2d 57, 65-68, 71 (3d Cir. 1991); *Boffard v. Barnes*, [248 N.J. Super. 501,] 591 A.2d 699, 702 (N.J. Super. Ct. Ch. Div. 1991); *Klebanoff v. McMonagle*, [380 Pa. Super. 545,] 552 A.2d 677, 678, 682 (Pa. Super. Ct. 1988), *appeal denied*, [522 Pa. 620,] 563 A.2d 888 (Pa. 1989); *Valenzuela v. Aquino*, 800 S.W.2d 301, 304-06 (Tex. Ct. App. 1990), *petition for review granted* (Tex. May 1, 1991), [*aff'd in part, rev'd in part*, No. D-0740, 853 S.W.2d 512 (1993)].

9. Given the defendants' repeated actions against Dr. Kaplan and his family over the last year, the Court finds that it should grant equitable relief to protect the Kaplans from targeted picketing and other threatening conduct, while at the same time tailoring that relief to protect the defendants' exercise of their First Amendment rights. The defendants' conduct in the Kaplans' neighborhood, and the physical characteristics of that neighborhood, indicate that without an injunction prohibiting picketing and similar activities on the Kaplans' street and within 300 feet of that street, the interest in upholding residential peace, privacy, and security would go unserved. An injunction of this sort will be narrowly tailored to serve the interest in protecting residential peace, privacy, and security.

10. An injunction to stop targeted residential picketing in the Kaplans' neighborhood is based not on the content of any would-be picketers' speech, but on the effects caused by the picketers' physical presence.

WHEREFORE, based on these findings, THE COURT ENJOINS AND RESTRAINS the defendants, their officers, agents, servants, and employees, and all persons in active concert or participation with them who receive actual notice of this order:

A. from picketing, parading, marching, or demonstrating anywhere on Waycross Drive in Greensboro, North Carolina;

B. from picketing, parading, marching, or demonstrating anywhere within 300 feet of the center line of Waycross Drive, including any parts of any other street that fall within 300 feet of the center line of Waycross Drive;

C. from threatening or communicating threats to any of the plaintiffs, at their home or elsewhere; and

D. from personally confronting any of the plaintiffs in a threatening manner, at their home or elsewhere.

The Court orders copies of this order to be served on the identified defendants in this action, and on the other defendants as soon as they are identified. A person will have actual notice of this order when he or she has personally received a true copy of it.

This injunction will take effect as soon as the plaintiffs jointly post a $2,000 cash or secured bond, pursuant to [G.S. 1A-1,] Rule 65(c) of the North Carolina Rules of Civil Procedure. Unless earlier modified by consent or by the Court, this injunction will remain in effect until this manner is resolved by a final judgment.

This injunction was entered in open court, 10 February 1992, at 1:55 p.m.

As evidenced by the attached bond filing, the plaintiffs posted the required bond on 10 February 1992, at 4:53 p.m.

The undersigned Judge Presiding retains jurisdiction of this matter for purposes of any further proceedings in this case; including any matters pertaining to this Preliminary Injunction Order.

This written order is entered this 20th day of February, 1992 at 11:00 a.m.

From the trial court's 20 February 1992 order granting the preliminary injunction, defendants appeal.

*Smith Helms Mulliss & Moore, by Alan W. Duncan and Matthew W. Sawchak, for plaintiff-appellees.*

*Arthur J. Donaldson and Walter M. Weber for defendant-appellants Prolife Action League of Greensboro, William H. Winfield, Jr., and Linda Winfield.*

*William G. Simpson, Jr., Legal Director, North Carolina Civil Liberties Union Legal Foundation, and Tharrington, Smith & Hargrove, by Burton Craige, for Amicus Curiae North Carolina Civil Liberties Union Legal Foundation.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, by Hubert Humphrey, and Ann E. Allen, General Counsel, The American College of Obstetricians & Gynecologists, for Amicus Curiae The American College of Obstetricians & Gynecologists.*

EAGLES, Judge.

## I. *Background*

This appeal arises from the trial court's grant of a preliminary injunction which restrained the manner and place in which defendants could protest in the streets adjoining plaintiffs' home. Defendants bring forward eleven assignments of error challenging several of the trial court's findings and the constitutionality of the order granting the preliminary injunction. Upon careful consideration of the briefs, transcript, and record, we affirm.

Initially, we note that this case presents a direct confrontation of fundamental Constitutional principles. On the one hand, it is well established that "a bedrock principle underlying the First Amendment . . . is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 105 L.Ed.2d 342, 360 (1989) (citations omitted); U.S. Const. Amend. I ("Congress shall make no law . . . abridging the freedom of speech"); U.S. Const. Amend XIV (providing that the provisions of the First Amendment are applicable to the states); N.C. Const. Art. I, § 14 ("Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse");

*Carey v. Brown*, 447 U.S. 455, 460, 466-67, 65 L.Ed.2d 263, 269, 273 (1980) ("There can be no doubt that in prohibiting peaceful picketing on the public streets and sidewalks in residential neighborhoods, . . . expressive conduct that falls within the First Amendment's preserve [is regulated]"; and noting that public issue picketing "has always rested on the highest rung of the hierarchy of First Amendment values"); *Corum v. University of North Carolina*, 330 N.C. 761, 781, 413 S.E.2d 276, 289, *cert. denied, sub nom. Durham v. Corum*, --- U.S. ---, 121 L.Ed.2d 431 (1992) ("The words 'shall never be restrained' [in N.C. Const. Art. I, § 14] are a direct personal guarantee of each citizen's right of freedom of speech"). On the other hand, "[t]he Constitution extends special safeguards to the privacy of the home, just as it protects other special privacy rights such as those of marriage, procreation, motherhood, child rearing, and education." *United States v. Orito*, 413 U.S. 139, 142, 37 L.Ed.2d 513, 517 (1973) (citations omitted); *Carey*, 447 U.S. at 471, 65 L.Ed.2d at 276 ("Preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value. . . . The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society"); *Frisby v. Schultz*, 487 U.S. 474, 485, 101 L.Ed.2d 420, 432 (1988) ("[W]e have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom").

It is significant that plaintiff Dr. Kaplan neither maintains a medical office at his residence nor treats any patients there. *See Frisby*, 487 U.S. at 488, 101 L.Ed.2d at 434. "[T]he North Carolina General Assembly has made a 'clear and deliberate choice' regarding the competing values at issue by choosing to make those abortions performed in accordance with the provisions of N.C. Gen. Stat. § 14-45.1 lawful." *State v. Thomas*, 103 N.C. App. 264, 267, 405 S.E.2d 214, 216, *disc. rev. denied*, 329 N.C. 792, 408 S.E.2d 528 (1991); *see Azzolino v. Dingfelder*, 315 N.C. 103, 113, 337 S.E.2d 528, 535 (1985), *cert. denied*, 479 U.S. 835, 93 L.Ed.2d 75 (1986), *reh'g denied*, 319 N.C. 227, 353 S.E.2d 401 (1987). As the trial court correctly noted, our General Assembly has provided that abortions are lawful medical procedures when "performed by a physician licensed to practice medicine in North Carolina . . ." G.S. 14-45.1(a), (b). *See Planned Parenthood v. Casey*, --- U.S. ---, ---, ---, 120 L.Ed.2d 674, 694, 716 (1992). Dr. Kaplan is a licensed

KAPLAN v. PROLIFE ACTION LEAGUE OF GREENSBORO

[111 N.C. App. 1 (1993)]

physician engaged in a lawful occupation under the laws of our State. The freedom to engage in a lawful occupation comes within those liberties protected by the Fourteenth Amendment to the United States Constitution. *Meyer v. Nebraska*, 262 U.S. 390, 399, 67 L.Ed. 1042, 1045 (1923); *Nova University v. The Board of Governors*, 305 N.C. 156, 164, 287 S.E.2d 872, 878 (1982); *Presnell v. Pell*, 298 N.C. 715, 724, 260 S.E.2d 611, 617 (1979). In sum, here we are presented with a situation in which

> [c]onflicts in the exercise of rights arise and the conflicting forces seek adjustments in the courts, as do these parties, claiming on the one side the freedom of ... speech ... guaranteed by the Fourteenth Amendment, and on the other the right to employ the sovereign power explicitly reserved to the State by the Tenth Amendment to ensure orderly living, without which constitutional guarantees of civil liberties would be a mockery. Courts, no more than Constitutions, can [sic] intrude into the consciences of men . . . but courts are competent to adjudge the acts men do under color of a constitutional right, such as that of freedom of speech . . . and to determine whether the claimed right is limited by other recognized powers, equally precious to mankind.

*Jones v. Opelika*, 316 U.S. 584, 593-94, 86 L.Ed. 1691, 1699-1700 (1942) (footnotes omitted), *vacated on other grounds*, 319 U.S. 103, 87 L.Ed. 1290 (1943); *see Casey*, --- U.S. at ---, 120 L.Ed.2d at 697 ("Men and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage. Some of us as individuals find abortion offensive to our most basic principles of morality, but that cannot control our decision. Our obligation is to define the liberty of all, not to mandate our own moral code"); *see also Hague v. C.I.O.*, 307 U.S. 496, 515-16, 83 L.Ed. 1423, 1436-37.

With these important competing principles in mind, we proceed with an examination of the preliminary injunction before us.

II. *Appealability of the Order Granting a Preliminary Injunction*

[1] On 20 February 1992, the trial court issued an order granting plaintiffs' motion for a preliminary injunction. Defendants appealed from that order. Since defendants elected to appeal before the ultimate questions raised by the pleadings are decided at a trial

on the merits, the sole question before us is whether the trial court erred in its issuance of the preliminary injunction.

"As a general rule, a preliminary injunction 'is an extraordinary measure taken by a court to preserve the status quo of the parties during litigation.'" *A.E.P. Industries v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759 (1983) (*quoting Investors, Inc. v. Berry*, 293 N.C. 688, 701, 239 S.E.2d 566, 574 (1977)). G.S. 1-485 provides:

> A preliminary injunction may be issued by order . . . :
>
> > (1) When it appears by the complaint that the plaintiff is entitled to the relief demanded, and this relief, or any part thereof, consists in restraining the commission or continuance of some act the commission or continuance of which, during the litigation, would produce injury to the plaintiff . . . .

G.S. 1-485. *See* G.S. 1A-1, Rule 65. Regarding the appealability of preliminary injunctions, our Supreme Court has stated:

> A preliminary injunction is interlocutory in nature, issued after notice and hearing, which restrains a party pending final determination on the merits. G.S. § 1A-1, Rule 65. Pursuant to G.S. § 1-277 and G.S. § 7A-27, no appeal lies to an appellate court from an interlocutory order or ruling of a trial judge unless such order or ruling deprives the appellant of a substantial right which he would lose absent a review prior to final determination. As we recently stated in *State v. School*, 299 N.C. 351, 357-58, 261 S.E.2d 908, 913, *appeal dismissed*, 449 U.S. 807 (1980):
>
> > The purpose of a preliminary injunction is ordinarily to preserve the *status quo* pending trial on the merits. Its issuance is a matter of discretion to be exercised by the hearing judge after a careful balancing of the equities. Its impact is temporary and lasts no longer than the pendency of the action. Its decree bears no precedent to guide the final determination of the rights of the parties. In form, purpose, and effect, it is purely interlocutory. Thus, the threshold question presented by a purported appeal from an order granting a preliminary injunction is whether the appellant has been deprived of any substantial right which might be lost should the order escape appellate

KAPLAN v. PROLIFE ACTION LEAGUE OF GREENSBORO

[111 N.C. App. 1 (1993)]

review before final judgment. If no such right is endangered, the appeal cannot be maintained. (Citations omitted.)

See Waters v. Personnel, Inc., 294 N.C. 200, 240 S.E.2d 338 (1978); Pruitt v. Williams, 288 N.C. 368, 218 S.E.2d 348 (1975).

A.E.P. Industries, 308 N.C. at 400-01, 302 S.E.2d at 759. Thus, in addressing the "threshold question" presented by this appeal, id. at 400, 302 S.E.2d at 759, we conclude that given the important First Amendment principles at issue, substantial rights of the defendants have been affected. Cf. Frisby, 487 U.S. at 479, 101 L.Ed.2d at 428 (appeal from order granting a preliminary injunction against town seeking to enforce ordinance against residential picketers presented a question of "substantial importance"); Elrod v. Burns, 427 U.S. 347, 373, 49 L.Ed.2d 547, 565 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Accordingly, we address the issues presented by defendants in this appeal.

III. The Standard of Review for Preliminary Injunctions

[2] In our review of the trial court's order granting a preliminary injunction, "a decision by the trial court to issue . . . an injunction will be upheld if there is ample competent evidence to support the decision, even though the evidence may be conflicting and the appellate court could substitute its own findings." Wrightsville Winds Homeowners' Assn. v. Miller, 100 N.C. App. 531, 535, 397 S.E.2d 345, 346 (1990), disc. rev. denied, 328 N.C. 275, 400 S.E.2d 463 (1991) (citing Robins & Weill v. Mason, 70 N.C. App. 537, 540, 320 S.E.2d 693, 696, disc rev. denied, 312 N.C. 495, 322 S.E.2d 559 (1984)). See Edmisten, Attorney General v. Challenge, Inc., 54 N.C. App. 513, 516, 284 S.E.2d 333, 335-36 (1981) ("there is a presumption that the judgment entered below is correct, and the burden is upon appellant to assign and show error"); Conference v. Creech, 256 N.C. 128, 123 S.E.2d 619 (1962); Lance v. Cogdill, 238 N.C. 500, 78 S.E.2d 319 (1953).

In determining whether a preliminary injunction was properly issued, we examine the trial court's inquiry, which is a two stage process. "The first stage of the inquiry is . . . whether plaintiff is able to show likelihood of success on the merits." A.E.P. Industries, 308 N.C. at 401, 302 S.E.2d at 760. The second stage of the inquiry considers whether " 'plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion

of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation.' " *Id.* at 401, 302 S.E.2d at 759-60 (*quoting Investors, Inc.*, 293 N.C. at 701, 239 S.E.2d at 574). "To constitute irreparable injury it is *not* essential that it be shown that the injury is beyond the possibility of repair or possible compensation in damages, but that the injury is one to which the complainant should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law." *Barrier v. Troutman*, 231 N.C. 47, 50, 55 S.E.2d 923, 925 (1949) (emphasis added) (citations omitted); *A.E.P. Industries*, 308 N.C. at 407, 302 S.E.2d at 763; *Wrightsville Winds Homeowners' Assn.*, 100 N.C. App. at 535, 397 S.E.2d at 347. Additionally, "[t]he judge in exercising his discretion should engage in a balancing process, weighing potential harm to the plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted. In effect, the harm alleged by the plaintiff must satisfy a standard of relative substantiality as well as irreparability." *Williams v. Greene*, 36 N.C. App. 80, 86, 243 S.E.2d 156, 160, *disc. rev. denied, appeal dismissed*, 295 N.C. 471, 246 S.E.2d 12 (1978) (*citing Huggins v. Board of Education*, 272 N.C. 33, 157 S.E.2d 703 (1967) ). Finally, we note that the findings of fact and other proceedings of the trial court which hears the application for a preliminary injunction are not binding at a trial on the merits. *Schloss v. Jamison*, 258 N.C. 271, 276-77, 128 S.E.2d 590, 594 (1962); *Huskins v. Hospital*, 238 N.C. 357, 362, 78 S.E.2d 116, 120-21 (1953).

IV. *Analysis of Plaintiffs' Claims as a Basis for the Preliminary Injunction*

In their fifth assignment of error, defendants contend that the trial court "erred by concluding that the Kaplans were likely to prevail on the merits of their claims for private nuisance and intentional infliction of emotional distress."

"The burden is on the plaintiffs to establish their right to a preliminary injunction." *Pruitt v. Williams*, 288 N.C. 368, 372, 218 S.E.2d 348, 351 (1975) (*citing* G.S. 1A-1, Rule 65(b); *Setzer v. Annas*, 286 N.C. 534, 212 S.E.2d 154 (1975); *Board of Elders v. Jones*, 273 N.C. 174, 159 S.E.2d 545 (1968) ). Plaintiffs' complaint alleged seven separate causes of action: 1) private nuisance, *see* G.S. 1-539; 2) public nuisance, *see* G.S. 1-539; 3) intentional infliction of emotional distress; 4) invasion of privacy; 5) violations of the

North Carolina Racketeer Influenced and Corrupt Organizations Act, *see* G.S. Chapter 75D; 6) violations of the federal Racketeer Influenced and Corrupt Organizations Act (later dismissed by plaintiffs on 21 January 1992 pursuant to G.S. 1A-1, Rule 41(a)(1) ), and 7) violations of G.S. 99D-1 (interference with civil rights). Accordingly, plaintiffs offered six legal theories to support their preliminary injunction motion. After a hearing on 10 February 1992, the trial court specifically referred to two of plaintiffs' claims (intentional infliction of emotional distress and private nuisance, *see* finding of fact No. 5) in determining that the preliminary injunction should be granted. We now examine each of these claims.

A. *Intentional Infliction of Emotional Distress*

[3] Defendants argue that plaintiffs have failed to show a likelihood of success on their intentional infliction of emotional distress claim at a trial on the merits. We agree.

In their complaint, plaintiffs' claim for the intentional infliction of emotional distress was set forth in the following paragraphs.

37. By organizing and executing their campaign of intimidation and harassment against the Kaplans, particularly Jacob and David Kaplan, the defendants have engaged and are engaging in outrageous conduct. The defendants intend that this conduct cause the Kaplans severe emotional distress. The defendants' campaign, indeed, seeks to use exactly this emotional distress to drive Dr. Kaplan out of part of his medical practice.

38. This intentional conduct is causing the Kaplans, especially Marguerite Kaplan and the Kaplans' children, Jacob and David Kaplan, severe and irreparable fear, embarrassment, and humiliation.

In *Dickens v. Puryear*, 302 N.C. 437, 446-47, 276 S.E.2d 325, 331-32 (1981), our Supreme Court stated:

The tort of intentional infliction of mental distress is recognized in North Carolina. *Stanback v. Stanback*, 297 N.C. 181, 254 S.E.2d 611 (1979). "[L]iability arises under this tort when a defendant's 'conduct exceeds all bounds usually tolerated by decent society' and the conduct 'causes mental distress of a very serious kind.'" *Id.* at 196, 254 S.E.2d at 622, *quoting* Prosser [Law of Torts], § 12, p. 56 [(4th Ed. 1971)]. . . .

The tort alluded to in *Stanback* is defined in the Restatement § 46 as follows:

> "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

The holding in *Stanback* was in accord with the Restatement definition of the tort of intentional infliction of mental distress. We now reaffirm this holding.

Our Supreme Court then pronounced in *Dickens* that the essential elements of the tort of the intentional infliction of emotional distress are "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another." *Dickens*, 302 N.C. at 452, 276 S.E.2d at 335; *Waddle v. Sparks*, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992). *See also* Restatement (Second) of Torts § 46(1) (1965).

Later, in *Waddle v. Sparks*, 331 N.C. 73, 83, 414 S.E.2d 22, 27 (1992), our Supreme Court adopted the following definition of the "severe emotional distress" element of the tort of the intentional infliction of emotional distress:

> [T]he term "severe emotional distress" means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of *severe and disabling* emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.

*Id.* (quoting *Johnson v. Ruark Obstetrics & Gynecology Assoc.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97, *reh'g denied*, 327 N.C. 644, 399 S.E.2d 133 (1990) (emphasis added)). Our Supreme Court then proceeded to further discuss the element of "severe emotional distress" and the rationale for its high standard of proof:

> Support for a high standard of proof on the severe emotional distress element can also be found in the second Restatement of Torts, from which we have derived most of our present standards for the remaining elements of intentional infliction of emotional distress.

> The rule stated in this section applies only where the emotional distress has in fact resulted, and where it is

**KAPLAN v. PROLIFE ACTION LEAGUE OF GREENSBORO**

[111 N.C. App. 1 (1993)]

severe. Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. *It is only where it is extreme that the liability arises.* Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. *The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.* The intensity and the duration of the distress are factors to be considered in determining its severity. . . . It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.

Restatement (Second) of Torts § 46 cmt. j (1965) (emphasis added). *See also Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309 (6th Cir. 1989) (applying Ohio law); *Polk v. Yellow Freight System, Inc.*, 801 F.2d 190 (6th Cir. 1986) (applying Michigan law); and *Hubbard v. United Press Internat'l, Inc.*, 330 N.W.2d 428 (Minn. 1983).

As the drafters of the Restatement point out, the rationale for limiting or restricting liability for intentional infliction of emotional distress is simple:

The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt.

Restatement (Second) of Torts § 46 cmt. d (1965).

*Waddle*, 331 N.C. at 83-84, 414 S.E.2d at 27-28 (emphasis in original). Citing our Supreme Court's discussion of the element of "severe emotional distress" set forth in *Waddle*, 331 N.C. at 83-85, 414 S.E.2d at 27-28, defendants argue that

The Kaplans have not even encountered "rough language" from the Winfields. Instead, the Kaplans face a peaceful but pointed public protest on a highly emotional public issue — abortion. The Kaplans may be angry, upset, or irritated at the Winfields' pro-life marching, but putting up with such protest is no more than the price of freedom in a contentious society.

The Kaplans allege in conclusory fashion that they have suffered "severe and irreparable fear, embarrassment, and humiliation." The Kaplans, however, have alleged no specific facts whatsoever to show that any of them have acquired the type of "severe and disabling emotional or mental condition" required [by *Waddle*] to establish a claim of intentional infliction of emotional distress.

Plaintiffs argue that "[t]he decision defendants cite as setting a new standard for emotional distress, *Waddle v. Sparks*, 331 N.C. 73, 414 S.E.2d 22 (1992), came down after the conduct [which began in 1991], the complaint [filed 14 January 1992], and the preliminary injunction [entered 10 February 1992] in this case. Even if this standard applies retroactively, the record supports the conclusion that the Kaplans will prove severe emotional distress." We disagree. First, the standard for severe emotional distress discussed in *Waddle* was applied to the *Waddle* plaintiffs, who filed their complaint in that action on 20 April 1988, over two years prior to the conduct complained of here. *Id.* at 76, 414 S.E.2d at 23. Accordingly, we too must apply *Waddle* here to determine whether plaintiffs have established a likelihood of success on the merits.

We conclude that plaintiffs have not established a likelihood of success on the merits as to their intentional infliction of emotional distress claim. The record is devoid of any indication of the existence "of any medical documentation of plaintiffs' alleged 'severe emotional distress' " or of "any other forecast of evidence of 'severe and disabling' psychological problems within the meaning of the test laid down in *Johnson v. Ruark*, 327 N.C. at 304, 395 S.E.2d at 97." *Waddle*, 331 N.C. at 85, 414 S.E.2d at 28. Instead, as support for their argument, plaintiffs merely point to: 1) the allegations of the verified complaint stating that the plaintiffs were "frightened," "intimidated," and "upset" and have suffered "severe and irreparable fear, embarrassment, and humiliation" and; 2) affidavits from plaintiffs' "friends and colleagues [showing that they] have observed the [plaintiffs'] distress" essentially supporting the

complaint's allegations. This evidence does not indicate a likelihood of meeting the "high standard of proof" required by *Waddle. Id.* at 83, 414 S.E.2d at 27. On the record now before us, we conclude that there is not sufficient competent evidence to support the trial court's decision that there is a likelihood that plaintiffs will succeed on their intentional infliction of emotional distress claim at a trial on the merits. *Wrightsville Winds Homeowners' Assn.*, 100 N.C. App. at 535, 397 S.E.2d at 346.

B. *Private Nuisance*

[4] Defendants contend that "[t]he Winfields [defendants] did not misuse any property under their control. Therefore, there can be no private nuisance." We disagree. To support this argument, defendants cite excerpts from two cases from our Supreme Court. *Watts v. Manufacturing Co.*, 256 N.C. 611, 617, 124 S.E.2d 809, 813 (1962) (" 'The law of private nuisance rests on the concept embodied in the ancient legal maxim *Sic utere tuo ut alienum non laedas*, meaning, in essence, that every person should so use his own property as not to injure that of another' "); *Morgan v. Oil Co.*, 238 N.C. 185, 193, 77 S.E.2d 682, 689 (1953) ("[A] private nuisance exists in a legal sense when one makes an improper use of his own property and in that way injures the land or some incorporeal right of one's neighbor"). "The essence of a private nuisance is an interference with the use and enjoyment of land. The ownership or rightful possession of land necessarily involves the right not only to the unimpaired condition of the property itself, but also to some reasonable comfort and convenience in its occupation." Prosser and Keeton on the Law of Torts, § 87, p. 619 (5th ed. 1984) (footnote omitted). Regarding the tort of private nuisance and the issuance of injunctive relief based upon a claim of private nuisance, this Court has stated:

A private nuisance action may arise from the defendant's intentional and unreasonable conduct. . . . *Pendergrast v. Aiken*, 293 N.C. 201, 236 S.E.2d 787 (1977); Restatement (Second) of Torts Sec. 822 (1979); see Prosser and Keeton on the Law of Torts Sec. 87, at 622-23 (W. Keeton 5th ed. 1984) (elements of intentional nuisance). . . . [W]e must apply the law of intentional private nuisance in evaluating plaintiffs' claim for injunctive relief.

The degree of unreasonableness of the defendants' conduct determines whether damages or permanent injunctive relief

is the appropriate remedy for an intentional private nuisance. Unreasonable interference with another's use and enjoyment of land is grounds for damages. *Pendergrast v. Aiken; see Kent v. Humphries*, 303 N.C. 675, 281 S.E.2d 43 (1981). To award damages, the defendant's conduct, in and of itself, need not be unreasonable. Prosser, *supra*, Sec. 87, at 623. In contrast, injunctive relief requires proof that the defendant's conduct itself is unreasonable; the gravity of the harm to the plaintiff must outweigh the utility of the conduct of the defendant. *Pendergrast v. Aiken.* "[I]t is necessary to show that defendant's conduct in carrying on the activity at the place and at the time the injunction is sought is unreasonable." Prosser, *supra*, Sec. 88A, at 631 (footnote omitted). The *Pendergrast* Court set forth the criteria for injunctive relief:

> Reasonableness is a question of fact to be determined in each case by weighing the gravity of the harm to the plaintiff against the utility of the conduct of the defendant. . . . Determination of the gravity of the harm involves consideration of the extent and character of the harm to the plaintiff, the social value which the law attaches to the type of use which is invaded, the suitability of the locality for that use, the burden on plaintiff to minimize the harm, and other relevant considerations arising upon the evidence. Determination of the utility of the conduct of the defendant involves consideration of the purpose of the defendant's conduct, the social value which the law attaches to that purpose, the suitability of the locality for the use defendant makes of the property, and other relevant considerations arising upon the evidence.

293 N.C. at 217, 236 S.E.2d at 797 (citations omitted); *see also* Prosser, *supra*, Sec. 89, at 640-41.

*Mayes v. Tabor*, 77 N.C. App. 197, 199-200, 334 S.E.2d 489, 490-91 (1985). In addressing the intentional interference requirement of a private nuisance claim, Prosser emphasizes that the interest protected is the use and enjoyment of a plaintiff's property and further explains that the fact that a defendant stands upon property other than his own does not preclude a claim for private nuisance:

> When the defendant engages in an activity with knowledge that this activity is interfering with the plaintiff in the use and enjoyment of his property, and the interference is substan-

tial and unreasonable in extent, the defendant is liable, and the monetary recovery is simply a cost of engaging in the kind of activity in which the defendant is engaged. *This is so whether the conduct is committed in the air (as by low-flying airplanes), on the highways, or on private property.*

§ 87, p.625 (emphasis added) (footnote omitted); *Morgan*, 238 N.C. at 193, 77 S.E.2d at 689 ("the feature which gives unity to this field of tort liability is the interest invaded, namely, the interest in the use and enjoyment of land; that *any* substantial nontrespassory invasion of another's interest in the private use and enjoyment of land by *any* type of liability forming conduct is a private nuisance"). *See Women's Health Care Services v. Operation Rescue*, 773 F.Supp. 258, 269 (D.Kan. 1991) (holding that plaintiffs had shown a substantial likelihood of ultimately demonstrating the existence of a claim of private nuisance against defendants who protested on streets). *See generally*, Nuisances, 66 C.J.S. § 88(a) ("It is not necessary in order to charge a person with liability for a nuisance that he should be the owner of the property on which it is created, but it is sufficient if he created it"). We conclude that the two cases cited by defendants do not preclude plaintiffs' private nuisance claim: the excerpt from *Watts*, 256 N.C. at 617, 124 S.E.2d at 813, refers to the historical origins of private nuisance, and the excerpt from *Morgan*, 238 N.C. at 193, 77 S.E.2d at 689, states one manner, but *not the only* manner, in which a private nuisance claim may arise.

We also conclude that the trial court here did not err in its balancing of the utility of defendants' conduct against the gravity of the harm to plaintiffs. *Mayes*, 77 N.C. App. at 200, 334 S.E.2d at 490-91; *Pendergrast*, 293 N.C. at 217, 236 S.E.2d at 797. While peaceful picketing is protected by the First Amendment, *Thornhill v. Alabama*, 310 U.S. 88, 95, 104, 84 L.Ed. 1093, 1098, 1103 (1940), peaceful residential picketing is not "beyond the reach of uniform and nondiscriminatory regulation." *Carey*, 447 U.S. at 470, 65 L.Ed.2d at 275, and, as discussed *infra* Part VII.C., ample alternative channels of communication exist for defendants to express their views. Numerous opinions have examined the substantial concerns regarding the captive audience that a home provides. *See Rowan v. Post Office Dept.*, 397 U.S. 728, 738, 25 L.Ed.2d 736, 744 (1970) ("That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be captives everywhere"); *Frisby*, 487 U.S. at 486, 487, 101

L.Ed.2d at 433, 433 ("The resident is figuratively, and perhaps literally, trapped within the home, and because of the unique and subtle impact of such picketing is left with no ready means of avoiding the unwanted speech" and emphasizing that "[t]he devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt"); *Klebanoff v. McMonagle*, 380 Pa. Super. 545, 549-50, 552 A.2d 677, 679 (1988), *appeal denied*, 522 Pa. 620, 563 A.2d 888 (1989) ("The home serves to provide, among other things, a refu[g]e from today's complex society where we are inescapably captive audiences for many purposes. Normally, outside of the home, consonant with the Constitution, we expect individuals to avoid unwanted speech, 'simply by averting [their] eyes.' But such avoidance within the walls of one's own house is not required"); *Trojan Elec. & Mach. Co. v. Heusinger*, 162 A.D.2d 859, 860, 557 N.Y.S.2d 756, 758-59 (1990); *Murray v. Lawson*, 264 N.J. Super. 17, 30, 624 A.2d 3, 10 (App. Div. 1993), *petition for cert. granted*, 133 N.J. 445, 627 A.2d 1149 (1993); *Boffard v. Barnes*, 248 N.J. Super. 501, 506, 591 A.2d 699, 701 (Ch. Div. 1991). *See also FCC v. Pacifica Foundation*, 438 U.S. 726, 748, 57 L.Ed.2d 1073, 1093, *reh'g denied*, 439 U.S. 883, 58 L.Ed.2d 198 (1978); *Kovacs v. Cooper*, 336 U.S. 77, 86-87, 93 L.Ed. 513, 522, *reh'g denied*, 336 U.S. 921, 93 L.Ed. 1083 (1949); *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 542, 65 L.Ed.2d 319, 331 (1980). *Compare Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210-11, 45 L.Ed.2d 125, 131-32 (1975); *Spence v. Washington*, 418 U.S. 405, 412, 41 L.Ed.2d 842, 848 (1974); *Cohen v. California*, 403 U.S. 15, 21, 29 L.Ed.2d 284, 291-92, *reh'g denied*, 404 U.S. 876, 30 L.Ed.2d 124 (1971). The First Amendment is not the guarantor of a captive audience; rather, the First Amendment ensures the reasonable opportunity to be heard. *Bering v. SHARE*, 106 Wash.2d 212, 232, 721 P.2d 918, 930 (1986), *cert. dismissed*, 479 U.S. 1050, 93 L.Ed.2d 990 (1987); *Frisby*, 487 U.S. at 487, 101 L.Ed.2d at 433 ("The First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech"); *Heffron v. Int'l Soc. for Krishna Consc.*, 452 U.S. 640, 647, 69 L.Ed.2d 298, 306 (1981) ("the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired"). Defendants' reasonable opportunity to be heard exists through the ample alternative channels of communication available to defendants.

We conclude that there is ample competent evidence to support the trial court's decision that there is a reasonable likelihood that

plaintiffs will prevail on their private nuisance claim at a trial on the merits. *Compare N.Y. State Nat. Organization for Women v. Terry*, 886 F.2d 1339, 1361-62 (2nd Cir. 1989), *cert. denied*, 495 U.S. 947, 109 L.Ed.2d 532 (1990) (public nuisance claim brought on behalf of the City of New York); Women's Health Care Services, 773 F.Supp. at 269 (D.Kan. 1991) (holding that plaintiffs had shown a substantial likelihood of ultimately demonstrating the existence of a claim of public nuisance as well as private nuisance against defendants who protested on streets). Given the substantial disruption of plaintiffs' residential privacy due to defendants' actions, we also conclude that the trial court correctly concluded that plaintiffs would likely sustain irreparable loss unless the injunction was issued at the time of the hearing, *A.E.P. Industries*, 308 N.C. at 401, 302 S.E.2d at 759, in that "the injury is one to which the complainant[s] should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law." *Barrier*, 231 N.C. at 50, 55 S.E.2d at 925 (citations omitted); *see Franklin Chalfont Associates v. Kalikow*, 392 Pa. Super. 452, 467, 573 A.2d 550, 558 (1990) (privacy interest in one's own home is "an interest which could be vindicated only by restoring it through injunctive relief"; *citing Klebanoff v. McMonagle*, 380 Pa. Super. 545, 552 A.2d 677 (1988), *appeal denied*, 522 Pa. 620, 563 A.2d 888 (1989) ).

## C. *Summary*

In sum, although the trial court erred as to plaintiffs' likelihood of success with the intentional infliction of emotional distress claim, we conclude that plaintiffs are likely to succeed on at least one of their claims (private nuisance) at a trial on the merits and that this claim warrants injunctive relief. "Where a trial court has reached the correct result, the judgment will not be disturbed on appeal even where a different reason is assigned to the decision." *Eways v. Governor's Island*, 326 N.C. 552, 554, 391 S.E.2d 182, 183 (1990) (*citing Shore v. Brown*, 324 N.C. 427, 378 S.E.2d 778 (1989); *Sanitary District v. Lenoir*, 249 N.C. 96, 105 S.E.2d 411 (1958); *Hayes v. Wilmington*, 243 N.C. 525, 91 S.E.2d 673 (1956) ). Accordingly, we consider defendants' other assignments of error concerning the trial court's findings and the specific injunctive relief ordered.

## V. *Trial Court's Finding Regarding Targeted Residential Picketing*

[5] In their third, sixth, ninth, and tenth assignments of error, defendants contend that the trial court "erred by finding that the

Winfields have engaged in targeted residential picketing." We disagree.

Here, we conclude that defendants' activities are narrowly directed at plaintiffs' household, not at the public. *Frisby*, 487 U.S. at 486, 101 L.Ed.2d at 433. The record includes *inter alia* the following evidence showing defendants' targeted picketing of plaintiffs' home: a statement by defendant William Winfield that he and the Prolife Action League of Greensboro would cease coming to the Kaplans' neighborhood only when Dr. Kaplan stopped performing abortions; evidence that on twelve separate occasions defendants have demonstrated on Waycross Drive in groups as large as approximately twenty-five people; evidence that signs used by the demonstrators specifically name Dr. Kaplan; literature disseminated by the Prolife Action League listing Dr. Kaplan as one of the "major abortionists from Greensboro that go to the clinics where we are praying"; evidence that defendants made similar demands in picketing the residences of other Women's Pavilion staff members, including an affidavit from Dr. Mark Anderson stating that "Mr. Winfield [defendant] told me that they would stop when I stopped 'killing babies.' . . . Because I wished these activities to stop, and based upon my conversation with Mr. Winfield, I have stopped performing abortions at the Women's Pavilion," and; evidence (including defendants' own admission) that the street in front of plaintiffs' home marks approximately the halfway point of the path of defendants' marches. All this evidence tends to support the trial court's finding that defendants engaged in targeted residential picketing. Since there is sufficient competent evidence to support the trial court's finding that defendants have engaged in targeted residential picketing, it is conclusive on appeal. Accordingly, these assignments of error fail.

VI. *Trial Court's Findings Regarding Defendants' Activities*

[6] In their second assignment of error, defendants contend that the trial court "erred by finding that the Winfields' activities are coercive," specifically taking exception to the finding in paragraph No. 2 of the order that "[t]he defendants have carried out activities designed to *coerce* Dr. Kaplan to stop performing abortions." (Emphasis added.) We disagree.

It is well established in First Amendment jurisprudence that one's mere claim that another's "expressions were intended to exercise a coercive impact . . . does not remove them from the reach

of the First Amendment." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 29 L.Ed.2d 1, 5 (1971); *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 910, 73 L.Ed.2d 1215, 1234, *reh'g denied*, 459 U.S. 898, 74 L.Ed.2d 160 (1982). The trial court's order does not refer to defendant's intent to exercise a coercive impact as being the basis for injunctive relief; rather the order specifically emphasizes that the court granted injunctive relief "to protect the Kaplans [plaintiffs] from targeted picketing and other threatening conduct." Furthermore, defendants concede in their affidavits and in their appellate brief that "[t]he Winfields admittedly aim to stop Dr. Kaplan and others from performing abortions." Since there is sufficient evidence to support this finding, it is conclusive on appeal. Accordingly, this assignment of error is overruled.

## VII. *Injunctive Relief*

[7] Having determined that the trial court's decision to grant an injunction was appropriate and that the trial court's challenged findings were supported by the evidence, our inquiry now focuses on the scope of the relief granted. In scrutinizing the relief afforded by the preliminary injunction, we adopt the analysis utilized in *Frisby v. Schultz*, 487 U.S. 474, 101 L.Ed.2d 420 (1988). In *Frisby*, the United States Supreme Court upheld as constitutional a town ordinance which proscribed "the following flat ban on all residential picketing: 'It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield.'" *Id.* at 477, 101 L.Ed.2d at 426-27. The constitutionality of the City of Greensboro ordinance is not at issue here. *See* Greensboro, N.C. Code of Ordinances § 26-157(b). However, we find the *Frisby* analysis appropriate and helpful in our inquiry regarding the constitutionality of the trial court's preliminary injunction. This inquiry essentially mirrors the approach utilized by federal appellate courts in analyzing injunctions against picketers in factual situations similar to that presented here, *see Northeast Women's Center, Inc. v. McMonagle*, 939 F.2d 57, 63 (3rd Cir. 1991), and has been adopted by other state courts as well, *see Klebanoff v. McMonagle*, 380 Pa. Super. 545, 548, 552 A.2d 677, 678 (1988), *appeal denied*, 522 Pa. 620, 563 A.2d 888 (1989); *Dayton Women's Health Ctr. v. Enix*, 68 Ohio App.3d 579, 588, 589 N.E.2d 121, 127 (1991), *appeal dismissed*, 62 Ohio St.3d 1500, 583 N.E.2d 971, *cert. denied sub nom. Sorrell v. Dayton Women's Health Center, Inc.*, --- U.S. ---, 120 L.Ed.2d 903 (1992).

The streets of Greensboro are traditional public fora, *Frisby*, 487 U.S. at 481, 101 L.Ed.2d at 429, *Hague v. C.I.O.*, 307 U.S. 496, 515, 83 L.Ed. 1423, 1436 (1939), and accordingly, *Frisby* provides that the preliminary injunction

> must be judged against the stringent standards we have established for restrictions on speech in traditional public fora:
>
>> "In these quintessential public for[a], the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. . . . The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."

*Frisby*, 487 U.S. at 481, 101 L.Ed.2d at 429 (*quoting Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45, 74 L.Ed.2d 794, 804 (1983)) (alteration in original).

### A. *Content-Neutral Requirement*

The first inquiry in *Frisby*, 487 U.S. at 481, 101 L.Ed.2d at 429, is whether the restriction is content-neutral. In their tenth assignment of error, defendants contend that the trial court "erred by concluding that its injunction is not a content-based restriction on speech." We disagree.

"Content-based regulations are presumptively invalid." *R.A.V. v. St. Paul*, --- U.S. ---, ---, 120 L.Ed.2d 305, 317 (1992) (citations omitted). However, the preliminary injunction here is content-neutral.

> Content-neutral regulations of expression are "those that 'are *justified* without reference to the content of the regulated speech.'" *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986) (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)). The primary concern of content-neutrality is that no speech or expression of a "particular content" is "single[d] out" by the government for better or worse treatment. *Virginia State Bd. of Pharmacy*, 425 U.S. at 771, 96 S.Ct. at 1830, *see also*

**KAPLAN v. PROLIFE ACTION LEAGUE OF GREENSBORO**

[111 N.C. App. 1 (1993)]

*Young v. American Mini Theaters, Inc.*, 427 U.S. 50, 67, 96 S.Ct. 2440, 2450-51, 49 L.Ed.2d 310 (1976) (government regulation of expression may not be sympathetic or hostile toward communicator's message). The test is neutrality.

*N.Y. State Nat. Organization for Women v. Terry*, 886 F.2d 1339, 1363 (2nd Cir. 1989), *cert. denied*, 495 U.S. 947, 109 L.Ed.2d 532 (1990) (emphasis in original) (alteration in original).

A close examination of the preliminary injunction here reveals that the injunction is content-neutral. The trial court's injunction prohibits picketing within a limited protected zone near plaintiffs' residence without referring to the subject matter of the picketers' expression. The injunction makes no mention of abortion or any other substantive issue. It does not flatly ban picketing throughout residential areas nor does it prohibit anti-abortion picketing while permitting residential picketing having other aims. *Dayton Women's Health Ctr. v. Enix*, 68 Ohio App.3d 579, 588, 589 N.E.2d 121, 127 (1991), *appeal dismissed*, 62 Ohio St.3d 1500, 583 N.E.2d 971, *cert. denied sub nom. Sorrell v. Dayton Women's Health Center, Inc.*, --- U.S. ---, 120 L.Ed.2d 903 (1992). The injunction provides no invitation to subjective or discriminatory enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 113, 33 L.Ed.2d 222, 230 (1972). We conclude that the trial court did not focus on the effect or impact of defendants' message on potential listeners, *Boos v. Barry*, 485 U.S. 312, 321, 99 L.Ed.2d 333, 344-45 (1988), but rather on defendants' physical presence having a deliberate intimidating effect on plaintiffs while at their home. *Northeast Women's Center, Inc. v. McMonagle*, 939 F.2d 57, 62-63 (3rd Cir. 1991). *See also Horizon Health Center. v. Felicissimo*, 263 N.J. Super. 200, 214, 622 A.2d 891, 898 (App. Div. 1993). Accordingly, this assignment of error fails.

## B. *Narrowly-Tailored Requirement*

[8]   The next inquiry examines whether the restriction "is 'narrowly tailored to serve a significant government interest' and whether it 'leave[s] open ample alternative channels of communication.'" *Frisby*, 487 U.S. at 482, 101 L.Ed.2d at 430 (*quoting Perry Education Assn.*, 460 U.S. at 45, 74 L.Ed.2d at 804) (alteration in original). Initially, we note that *Frisby* established that the "protection of residential privacy" from the "devastating effect of targeted picketing on the quiet enjoyment of the home" is a significant government interest. *Frisby*, 487 U.S. at 484, 486, 101 L.Ed.2d at 431, 433.

*See generally State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L.Ed.2d 406 (1987) ("The sanctity of the home is a revered tenet of Anglo-American jurisprudence. The law recognizes the special status of the home . . . . And the law has consistently acknowledged the expectation of and right to privacy within the home"). A restriction "is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485, 101 L.Ed.2d at 432 (*citing City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808-10, 80 L.Ed.2d 772, 789-90 (1984)).

In their seventh, eighth, ninth, and eleventh assignments of error, defendants challenge the manner in which the injunctive relief was tailored by contending that the trial court erred "by enjoining the Winfields from 'picketing, parading, marching, or demonstrating' along the entire length of a street [Waycross Drive] plus 300 feet in any direction from that street."

### 1. *Prior Restraint*

First, defendants argue that *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 29 L.Ed.2d 1 (1971) "bars injunctive relief here" and that the injunction is an unlawful prior restraint. We find *Keefe*, 402 U.S. 415, 29 L.Ed.2d 1, readily distinguishable. The *Keefe* Court rejected the state court's injunction (prohibiting the defendants' distribution of literature in a residential neighborhood) because it would have operated to suppress public expression without any demonstrable threat of a private wrong. *Id.* at 418-19, 29 L.Ed.2d at 5. Here, the fact that plaintiffs have shown a demonstrable threat of a private wrong (private nuisance, *see* Part IV.B. *supra*) shows that defendants' reliance on *Keefe* is misplaced.

> . . . [W]e must tread gingerly in the area of prior restraints (*Nebraska Press Association v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976)):

>> The thread running through all these cases is that prior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights.

But this is not at all the classic prior restraint case. It does not involve an injunction against publication of the communication of ideas: an anti-Semitic newspaper (*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)) or government documents (*New York Times v. United States*,

KAPLAN v. PROLIFE ACTION LEAGUE OF GREENSBORO

[111 N.C. App. 1 (1993)]

403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)) or public record information about criminal trials (*Nebraska Press Association [supra]*).

What this case rather involves is prevention of a private wrong: invasion of [plaintiffs'] privacy. As to that, *Near*, 283 U.S. at 709, 51 S.Ct. at 628, [75 L.Ed. at 1364,] *Nebraska Press Association*, 427 U.S. at 557-58, 96 S.Ct. at 2801-02[, 49 L.Ed.2d at 696-97] and *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 418, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1[, 5] (1971) all suggest an injunction to prevent private wrongs stands on a very different footing from injunctions that suppress the communication of information as such.

*Huskey v. National Broadcasting Co., Inc.*, 632 F. Supp. 1282, 1294, (N.D.Ill. 1986) (footnote omitted). See *Bering v. SHARE*, 106 Wash.2d 212, 235-37, 721 P.2d 918, 932-33, *cert. dismissed*, 479 U.S. 1050, 93 L.Ed.2d 990 (1987); *Trojan Elec. & Mach. Co. v. Heusinger*, 162 A.D.2d 859, 860, 557 N.Y.S.2d 756, 758 (App. Div. 1990); *see also Austin Congress Corp. v. Mannina*, 46 Ill.App.2d 192, 196 N.E.2d 33 (1964). Accordingly, we reject defendants' prior restraint argument.

### 2. *State Constitutional Argument*

Since defendants' contention regarding the constitutionality of the injunction under Article I, Section 14 of the North Carolina Constitution was not made before the trial court, this contention may not be raised for the first time on appeal. *Johnson v. Highway Commission*, 259 N.C. 371, 373, 130 S.E.2d 544, 546 (1963) ("It is a well established rule of this Court that it will not decide a constitutional question which was not raised or considered in the court below"); *Plemmer v. Matthewson*, 281 N.C. 722, 725, 190 S.E.2d 204, 206 (1972); *Bland v. City of Wilmington*, 278 N.C. 657, 660, 180 S.E.2d 813, 816 (1971); *Lane v. Insurance Co.*, 258 N.C. 318, 322, 128 S.E.2d 398, 400 (1962); *Pinnix v. Toomey*, 242 N.C. 358, 367, 87 S.E.2d 893, 901 (1955).

### 3. *The Scope of the Trial Court's Ban*

Next, defendants argue that

[a] municipality may ban "focused picketing taking place solely in front of a particular residence," *Frisby*, 487 U.S. at 483. But Greensboro already has a *Frisby*-type antipicketing or-

dinance, and the Winfields have obeyed this ordinance. The superior court's ban on all marching and picketing along more than an entire street went far beyond both the Greensboro ordinance and *Frisby*.

Given this argument, a brief discussion of pertinent additional information is necessary. As noted *supra*, the City of Greensboro passed an ordinance pertaining to residential picketing pursuant to G.S. 160A-174, the statute which delegates and limits the general ordinance-making powers of cities and towns:

(a) A city may by ordinance define, prohibit, regulate, or abate acts, omissions, or conditions, detrimental to the health, safety, or welfare of its citizen and the peace and dignity of the city, and may define and abate nuisances.

(b) A city ordinance shall be consistent with the Constitution and laws of North Carolina and of the United States. An ordinance is not consistent with State or federal law when:

(1) The ordinance infringes a liberty guaranteed to the people by the State or federal Constitution;

(2) The ordinance makes unlawful an act, omission or condition which is expressly made lawful by State or federal law;

(3) The ordinance makes lawful an act, omission, or condition which is expressly made unlawful by State or federal law;

(4) The ordinance purports to regulate a subject that cities are expressly forbidden to regulate by State or federal law;

(5) The ordinance purports to regulate a field for which a State or federal statute clearly shows a legislative intent to provide a complete and integrated regulatory scheme to the exclusion of local regulation;

(6) The elements of an offense defined by a city ordinance are identical to the elements of an offense defined by State or federal law.

The fact that a State or federal law, standing alone, makes a given act, omission, or condition unlawful shall not preclude city ordinances requiring a higher standard of conduct or condition.

Pursuant to this statute, section 26-157(b) of the Greensboro Code of Ordinances was enacted on 19 November 1990 and provides as follows: "*Individual Residence Picketing Prohibited.* Provided, in order to promote residential privacy and tranquility, it shall be unlawful for any person to picket solely in front of, before or about the residence or dwelling of any individual." *Compare Frisby*, 487 U.S. at 477, 101 L.Ed.2d at 426-27 (where the Town Board of Brookfield, Wisconsin enacted "the following flat ban on all residential picketing: 'It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield.' "). *Compare Boffard v. Barnes*, 248 N.J. Super. 501, 503, 591 A.2d 699, 700 (Ch. Div. 1991) (granting the issuance of a preliminary injunction even in the absence of a public ordinance; granting doctor's action for a preliminary injunction "based upon common law tort: deprivation of the use and enjoyment of property, and mental and emotional pain and anguish"); *Murray v. Lawson*, 264 N.J. Super. 17, 31, 624 A.2d 3, 11 (App. Div. 1993), *petition for cert. granted*, 133 N.J. 445, 627 A.2d 1149 (1993) (affirming permanent injunction and rejecting "the notion that courts are powerless to protect residential privacy simply because there is no local ordinance regulating focused or targeted residential picketing"). The record contains affidavits from a Greensboro Police Department detective, the Greensboro Police Department attorney, and the city attorney stating that defendants have not violated the department's or the city's interpretation of the ordinance.

Defendants' conclusion that they have acted within the permissible bounds of an ordinance, deduced summarily from the observation that they have not been cited for a violation nor arrested, does not preclude a trial court's issuance of a preliminary injunction where plaintiffs have demonstrated the likelihood of a tort by defendants under state law. G.S. 160A-174(b) specifically provides that "An ordinance is not consistent with State or federal law when: . . . (3) The ordinance makes lawful an act, omission, or condition which is expressly made unlawful by State or federal law." The necessary implication of G.S. 160A-174(b)(3) is that the General Assembly intended to allow the issuance of a preliminary injunction upon a showing by plaintiffs of a likelihood of success on the merits of a tort claim and some type of irreparable harm, *A.E.P. Industries*, 308 N.C. at 401, 302 S.E.2d at 759-60, *Wrightsville Winds Homeowners' Assn.*, 100 N.C. App. at 535, 397 S.E.2d at

346, even where an ordinance has not been enforced by local authorities or where an ordinance might permit one to pursue a course of action that otherwise would constitute a potential tort claim under state law. *Cf. Greene v. City of Winston-Salem*, 287 N.C. 66, 213 S.E.2d 231 (1975); *State v. Williams*, 283 N.C. 550, 196 S.E.2d 756 (1973). Accordingly, this argument is overruled.

Additionally, defendants argue that the trial court's ban "on all marching and picketing along more than an entire street went far beyond . . . *Frisby*." Specifically, the injunction enjoined and restrained defendants "from picketing, parading, marching, or demonstrating anywhere within 300 feet of the centerline of Waycross Drive, including any parts of any other street that fall within 300 feet of the center line of Waycross Drive." Plaintiffs' residence is located at 500 Waycross Drive. Dr. Kaplan does not maintain a medical office or treat patients at his residence. *See Frisby*, 487 U.S. at 488, 101 L.Ed.2d at 434. Waycross Drive is a non-thoroughfare residential street on which plaintiffs' home lies approximately at the midpoint and has no sidewalks. Waycross Drive begins from the south at a cul-de-sac just to the south of Staunton Drive, runs approximately two and one-half city blocks (going across Staunton Drive, Calverton Drive, Kenbridge Drive, and Monmouth Drive), and dead ends to the north at a golf course just north of Monmouth Drive. Plaintiffs' residence is located on Waycross Drive near the Calverton Drive cul-de-sac and is located approximately midway of the block between Staunton Drive (to the south) and Kenbridge Drive (to the north). The total area governed by the injunction is a protected zone encompassing 300 feet of each side of the center line of Waycross Drive, which as noted *supra* runs approximately two and one-half city blocks long.

This limited protected zone clearly does not offend defendants' First Amendment rights. *Compare Frisby*, 487 U.S. 474, 101 L.Ed.2d 420 (1988) (ruling on constitutionality of an *ordinance* of general applicability, prohibiting anyone, not just named defendants, from " 'picketing before or about the residence or dwelling of any individual' "); *see Northeast Women's Center, Inc. v. McMonagle*, 939 F.2d 57, 67 (3rd Cir. 1991) ("Of course, we are dealing with a remedial injunction and not an ordinance of general application. Hence, *Frisby* may not strictly apply to the instant injunction"). Decisions from other jurisdictions have upheld injunctions enjoining similar activities within similarly expansive boundaries. *Klebanoff v. McMonagle*, 380 Pa. Super. 545, 546, 552 A.2d 677, 677, *appeal*

*denied*, 522 Pa. 620, 563 A.2d 888 (affirming injunction permanently barring defendants "from picketing or demonstrating in the street directly in front of the home" of a doctor; where the trial court's final decree provided that defendants "are hereby enjoined and restrained from demonstrating, picketing or patrolling on Rogers Road, and any intersection with Rogers Road from Chelton Mills Drive to Serpentine Lane"); *Northeast Women's Center, Inc.*, 939 F.2d at 67 & n.14, 71 (3rd Cir. 1991) (upon remanding for further findings regarding trial court's chosen distances for permanent injunction, specifically noting that "[i]t may even be appropriate for the district court to retain the 2500 foot restriction if unusual or extraordinary circumstances are found" and in the interim establishing boundary prohibiting "congregating, picketing, patrolling, or demonstrating within five hundred (500) feet of the residence of any of plaintiff's employees, staff, owners or agents, or using bullhorns or other sound amplification equipment within twenty-five hundred (2500) feet of the residence of any of plaintiff's employees, staff, owners or agents"); *Dayton Women's Health Ctr. v. Enix*, 68 Ohio App.3d 579, 585-86, 588, 589 N.E.2d 121, 125, 127 (1991), *appeal dismissed*, 62 Ohio St.3d 1500, 583 N.E.2d 971, *cert. denied sub nom. Sorrell v. Dayton Women's Health Center, Inc.*, --- U.S. ---, 120 L.Ed.2d 903 (1992) (affirming order prohibiting " '[p]icketing in any form including parking, parading, or demonstrating which is *limited* to the homes of patients, employees, staff or volunteers of the Dayton Women's Health Center of the physicians performing services at the Dayton Women's Health Center.' (Emphasis added)."). Given the significant interest in protecting the use and enjoyment of one's own home, *Frisby*, 487 U.S. at 484, 101 L.Ed.2d at 431, this injunction does no more than address the exact source of the 'evil' it seeks to remedy. *Id.* at 485, 101 L.Ed.2d at 432. Accordingly, we conclude that this protected zone meets the constitutionally mandated requirement that the injunctive relief be narrowly tailored.

### C. *Ample Alternative Channels of Communication*

[9] We conclude that in all respects "the order is content-neutral and sufficiently narrow to protect the interests of those who are presumptively unwilling to receive this form of speech and have the right not to, while leaving open ample alternative channels of communication." *Dayton Women's Health Ctr. v. Enix*, 68 Ohio App.3d at 588, 589 N.E.2d at 127 (1991), *appeal dismissed*, 62 Ohio St.3d 1500, 583 N.E.2d 971, *cert. denied sub nom. Sorrell v. Dayton*

*Women's Health Center, Inc.,* --- U.S. ---, 120 L.Ed.2d 903 (1992). We note that plaintiffs' lawsuit does not seek to limit or preclude defendants' right to continue their demonstrations at Dr. Kaplan's business premises, which are "generally a more effective forum to disseminate their views, unless the picketers' objective is only to harass or intimidate an individual." *Town of Barrington v. Blake,* 568 A.2d 1015, 1021 (R.I. 1990); *Boffard,* 248 N.J. Super. at 506, 591 A.2d at 701. The record further discloses that plaintiffs do not seek to limit or preclude defendants' right to continue other activities such as leafletting. *See Martin v. Struthers,* 319 U.S. 141, 145-49, 87 L.Ed. 1313, 1318-20 (1943). The order leaves open ample alternative places and channels of communication, including *inter alia* Dr. Kaplan's private medical office, the Women's Pavilion in Greensboro, demonstrations at other public sites, door-to-door solicitations, the distribution of literature, telephone calls, and direct mailings. In sum, here defendants "have many outlets for their expressive activity, while the privacy and home life which is rightfully due [plaintiffs] can only be realized in one place, their home." *Klebanoff,* 380 Pa. Super. at 555, 552 A.2d at 682, *appeal denied,* 522 Pa. 620, 563 A.2d 888.

D. *Portion of the Order Enjoining the Prolife Action League*

**[10]**  In their first assignment of error, defendants contend that the trial court "erred by enjoining Prolife Action League of Greensboro when there is no finding of its separate legal identity or existence." We disagree.

Defendants' argument that Prolife Action League is not an entity subject to an injunction is meritless if not frivolous. First, defendants offer no authority for this argument in their brief. Although the Prolife Action League is not organized in a corporate or partnership form, evidence in the record indicates that it distributes literature, has its own mailing address, engages in correspondence, produces a monthly newsletter notifying interested persons of upcoming pro-life events such as meetings, pickets, and speeches, and organizes demonstrations. In her own affidavit, defendant Linda B. Winfield refers to herself as a director of the Prolife Action League. This assignment of error fails. *N.Y. State Nat. Organization for Women v. Terry,* 886 F.2d 1339, 1352 (2nd Cir. 1989), *cert. denied,* 495 U.S. 947, 109 L.Ed.2d 532 (1990); *Pro-Choice Network v. Project Rescue,* 799 F. Supp. 1417, 1423 (W.D.N.Y. 1992).

E. *Portion of Order Enjoining 'Defendants' Threatening Conduct*

[11]  In their fourth, sixth, ninth, and eleventh assignments of error, defendants contend that the trial court "erred by enjoining the Winfields from engaging in threatening conduct when there is no finding that the Winfields have engaged in any such conduct."

First, we address defendants' contention that the record is devoid of evidence of "threatening conduct" by defendants. The record shows that defendant Ronald W. Benfield (who has not personally appeared in this action) was convicted of a violation of G.S. 14-277.1 for threatening Dr. Kaplan on 8 August 1991 as follows: "You are mine. You killed my baby and I'm going to kill you. Don't fear God, fear me." The record further shows that defendants Mr. and Mrs. Winfield counselled Mr. Benfield on at least one occasion before the death threat was made and on at least two occasions after the death threat was made. The record further discloses that defendants' other actions could be reasonably perceived as threatening as well. Affidavits in the record support the trial court's finding. Sue P. Meschan, who lives in the house on Waycross Drive next to plaintiffs, stated in her affidavit that

> The demonstrations have been annoying, distressing, and intimidating to me and my family. From my interactions with them, I believe that the Kaplans also have found the demonstrations emotionally distressing and intimidating.
>
> . . . .
>
> The presence of these picketers has impaired my family's use and enjoyment of our property. When the picketers happen to be in front of our house, it makes it difficult to get in and out of our driveway, and it makes my family less likely to be in our front yard when the demonstrations are occurring.
> . . .
>
> The signs carried by the picketers often include gruesome pictures, which scare my children. . . .

Joan H. Osborne, who lives at the intersection of Waycross Drive and Kenbridge Drive, stated in her affidavit that defendants

> carry signs making reference to the fact that Dr. Kaplan "kills babies," and naming Dr. Kaplan. . . . More recently, the signs carried by these picketers have been even more brutal than

they were initially. They also seem to refer to Dr. Kaplan by name more frequently.

. . . .

The presence of the picketers has impaired our use of our property. It is difficult and disconcerting to try to drive through them when leaving or returning to our home. Also, I do not like to go out into my yard and do yard work when they are present. My sons normally enjoy playing football outdoors, but do not like to do so when these people are present.

I am aware through my interactions with the Kaplans that these picketers have caused the Kaplans a great deal of mental anguish.

A colleague of plaintiff Mrs. Kaplan stated that the affiant "share[d] Meg's [plaintiff's] feelings of anxiety and fear as a result of these tactics." The three affidavits from the staff members of the Women's Pavilion also support the trial court's finding that defendants have engaged in "threatening conduct." Since we find sufficient evidence to support the trial court's finding, it is conclusive on appeal.

However, we note that Paragraphs C and D of the preliminary injunction provide as follows:

WHEREFORE, based on these findings, THE COURT ENJOINS AND RESTRAINS the defendants, their officers, agents, servants, and employees, and all persons in active concert or participation with them who receive actual notice of this order:

. . . .

C. from threatening or communicating threats to any of the plaintiffs, at their home or elsewhere; and

D. from personally confronting any of the plaintiffs in a threatening manner, at their home or elsewhere.

Though it is our view that these aspects of the preliminary injunction are content-neutral, we are concerned that paragraphs C and D of the preliminary injunction be correctly construed. Accordingly, we adopt the following cautionary admonition set forth by another court with similar concerns:

"Content-based regulations are presumptively invalid." *R.A.V. v. St. Paul*, --- U.S. ---, ---, 112 S.Ct. 2538, 2542,

120 L.Ed.2d 305, 317 (1992). The . . . order . . . should not be construed to regulate the content of the demonstrator's message in any respect. As Justice Scalia said in the recent St. Paul hate-crime ordinance and cross-burning case: "[N]on verbal expressive activity can be banned because of the action it entails, but not because of the idea it expresses. . . ." --- U.S. at ---, 112 S.Ct. at 2544, 120 L.Ed.2d at 319. The "power to proscribe particular speech on the basis of a noncontent element (*e.g.*, noise) does not entail the power to proscribe the same speech on the basis of a content element. . . ." *Id.* In sum, the intellectual content of the message may not be the target of the injunction, *only the hostile method of its delivery.*

The injunction entered here may not be construed as a content-based restriction on expression. It must be construed as focusing specifically and exclusively on the·*location and manner of expression.*

*Horizon Health Center. v. Felicissimo,* 263 N.J. Super. 200, 223-24, 622 A.2d 891, 903 (App. Div. 1993) (emphasis added).

### VIII. *Conclusion*

For the reasons stated, we hold that the relief afforded in the trial court's preliminary injunction is constitutional in all respects. Except as modified with respect to plaintiffs' claim for the intentional infliction of emotional distress, the order below in all respects is

Affirmed.

Judges WELLS and MARTIN concur.